[No. B196598. Second Dist., Div. Four. July 14, 2008.]

ROGER PLUMLEY, Plaintiff and Respondent, v.
DOUGLAS ALFRED JAMES MOCKETT et al., Defendants and
Appellants.

## COUNSEL

Nemecek & Cole, Jonathan B. Cole, Jon D. Robinson and Susan S. Baker for Defendant and Appellant Douglas Alfred James Mockett.

Lewis Brisbois Bisgaard & Smith and Barry Zoller for Defendant and Appellant Sanford Astor.

Hill, Farrer & Burrill, Neil D. Martin and Whitney B. Hastings for Plaintiff and Respondent.

## OPINION

**SUZUKAWA, J.**—Respondent Roger Plumley (Plumley) sued appellants Douglas Alfred James Mockett (Mockett) and Sanford Astor (Astor) for malicious prosecution. Mockett and Astor (collectively, defendants) brought special motions to strike Plumley's complaint under Code of Civil Procedure section 425.16, commonly referred to as the "anti-SLAPP statute"[1] (strategic lawsuit against public participation). The trial court denied the motions to strike. Mockett and Astor appeal from the order. They contend (1) Plumley failed to establish that Mockett's federal patent case, on which the malicious prosecution claim is based, so totally lacked merit that no reasonable attorney would have filed it; and (2) there is insufficient evidence that defendants acted maliciously in bringing and pursuing the patent case. Because we agree that Plumley failed to make a prima facie showing that defendants lacked probable cause to bring the patent action, we reverse.

## FACTS AND PROCEDURAL HISTORY

### I. *Underlying Facts*

Mockett is the owner and president of Doug Mockett & Company, Inc. (DMC). Since 1981, DMC has marketed furniture-related products designed and patented by Mockett, including various kinds of grommets. Astor, a patent attorney, has filed patent applications on Mockett's behalf.

Plumley is a sales representative for Jet Plastics, Inc., a plastics manufacturer. Between 1989 and 1991, Jet Plastics manufactured all of DMC's injection-molded plastic parts.

On April 1, 1992, Plumley filed a patent application for a plastic grommet with a pivoting tab (pivoting-tab grommet or grommet). A grommet is a device that is placed into a hole drilled into the top of a desk to route wires and cords through the desktop to the floor. The pivoting-tab grommet that is the subject of this litigation has a pivoting cap that allows the grommet opening to be closed when the grommet is not in use.[2] On June 22, 1992,

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] The patent describes the grommet as a "wire management grommet assembly which includes a cap having an improved closure member for closing an opening in the cap. The closure member is movably captive to the cap in such a manner that the closure member is held firmly in its closed position and cannot inadvertently be moved from it. Also, the closure member, when moved to its open position, does not extend above the cap surface and does not interfere with wires, cords or cables engaged in and passing through the cap opening."

Mockett, through his attorney, Astor, filed his own patent application for the pivoting-tab grommet.

The Patent and Trademark Office (PTO) issued Plumley a patent for the pivoting-tab grommet on December 1, 1992. The PTO notified Mockett that it had rejected his application because a patent had previously been issued to Plumley for a similar device.

Mockett submitted a request to the PTO to institute an interference proceeding between Plumley's patent and Mockett's application in July 1993 (the interference).[3] The interference request was prepared by Astor, assisted by other counsel.

## II. *The State Court Action*

In December 1993, while the interference request was pending, Mockett sued Plumley in state court (the state tort action). The operative first amended complaint alleged that Mockett created the original design for the pivoting-tab grommet; that he communicated the grommet design to Plumley in order to obtain a bid from Jet Plastics, Inc., for whom Plumley was an independent sales representative; and that in February 1992, Mockett discovered that Plumley had copied Mockett's grommet design and had begun to manufacture and sell pivoting-tab grommets to the public. It asserted five causes of action: breach of confidence, implied contract, unfair competition, misappropriation of trade secrets, and breach of express contract.

Prior to trial, Plumley filed a motion in limine contending, among other things, that Mockett did not have a right to a jury trial on his unfair competition claim. (Bus. & Prof. Code, § 17200.) The court (Judge Florence-Marie Cooper) agreed and ruled that Mockett's legal and equitable claims would be tried simultaneously to the jury and the court.

The jury was unable to return a verdict on the legal issues submitted to it, deadlocking six to six on whether Mockett had disclosed the design for the pivoting-tab grommet to Plumley. Judge Cooper declared a mistrial on July 10, 1995.

Following the mistrial, Judge Cooper found that she had the power to rule on the equitable unfair competition cause of action even though the jury had

---

[3] An "interference" is an administrative proceeding conducted by the Board of Patent Appeals and Interferences to adjudicate a dispute between a patent applicant and a patent holder. (1 Moy's Walker on Patents (4th ed. 2007) § 3:64.)

been unable to reach a decision on the legal claims. On August 21, 1995, she issued a statement of decision in which she found as follows:

(1) Plumley did not sign a September 1, 1989 confidentiality agreement. His purported signature on that document was a forgery.

(2) Mockett did not send a June 19, 1990 letter that purported to disclose the pivoting-tab grommet to Plumley. That letter was written and backdated some time after Mockett saw Plumley's pivoting-tab grommet advertised in a trade publication. It was never sent to defendant.

(3) Mockett did not send an August 1, 1990 letter, which was an alleged followup to the June 19, 1990 letter, to Plumley.

(4) Plumley first conceived the idea for the pivoting-tab grommet.

(5) Plumley first made a working model of the pivoting-tab grommet.

(6) Plumley invented the pivoting-tab grommet.

(7) Mockett first obtained the idea of a pivoting-tab grommet from a review of Plumley's advertising.

(8) Mockett did not prove legal damages.

(9) Mockett's alleged 3/91 conception sketch was fabricated after 3/91.

(10) Mockett did not, at any time, disclose the idea of a pivoting-tab grommet to Plumley.

On the basis of these findings, Judge Cooper concluded that there were no unresolved jury issues and she ruled in Plumley's favor on all of Mockett's claims, both equitable and legal. Judgment was entered on September 21, 1995.

Mockett appealed. On May 6, 1997, the Court of Appeal issued an opinion affirming the judgment. The California Supreme Court denied Mockett's petition for review on July 23, 1997, and the United States Supreme Court denied his petition for a writ of certiorari on December 1, 1997. The decision of the Court of Appeal became final on December 5, 1997.[4]

---

[4] After the Court of Appeal's decision became final, Plumley filed an action for malicious prosecution against Mockett and his company, asserting that the superior court action had been filed with malice and without probable cause. Plumley dismissed that action on December 28, 2000.

### III. *The Federal Interference Action*

#### A. *The Board of Patent Appeals and Interferences Decision*

Shortly after Mockett filed the state court action, he received notice from the PTO that it had instituted an interference between Plumley's patent and Mockett's application. Mockett pursued two theories in the interference: "derivation" and "priority." To establish derivation, Mockett had to establish that he (1) conceived of the grommet first, and (2) communicated his conception to Plumley. To establish priority, Mockett had to establish that he (1) conceived of the grommet first, and (2) was excused from reducing the invention to practice. (*Price v. Symsek* (Fed. Cir. 1993) 988 F.2d 1187, 1190.)

The interference hearing took place before a three-member panel of the Board of Patent Appeals and Interferences (Board), which conducted a final hearing on July 24, 1996. It issued its final opinion on September 30, 1996.

The Board admitted the records of the state tort action "for what they are worth," but said that Judge Cooper's findings did not bind it in any manner. It explained that the judgment entered in the state tort action was then on appeal and had not yet been made final; thus, it was not entitled to any preclusive or collateral effect. Further, the Board said, although certain traditional state law concerns may properly be raised when patent rights are litigated, "[t]he statute at 35 U.S.C. §§ 135 and 7 gives this Board and the Patent and Trademark Office (PTO) original jurisdiction to decide interferences between an application and a patent, as in this instance. To give preclusive effect to the state court proceedings would be an inappropriate collateral intrusion on the regulatory procedures of the PTO, and is contrary to Congress' preemptive regulation in the area of patent law." Moreover, "while the ultimate question of whether a patentee derived an invention from another is one of fact, the determination of whether there was a prior conception is a question of law, based on subsidiary factual findings. [Citations.] It cannot be doubted, then, that we are not bound to follow a state court when the underlying determinations are questions of law that we must decide for ourselves."

The Board then turned to the merits of Mockett's derivation claim. The Board noted that the two elements of a claim for derivation—(1) "prior conception of the claimed subject matter" and (2) "communication of the conception to the adverse claimant"—must be independently corroborated, considering all of the circumstances in the record, by a preponderance of the evidence. Further, the subject matter communicated must have been sufficient

to enable "one of ordinary skill in the art to construct and successfully operate the invention." Finally, because derivation is usually difficult to establish by direct evidence, it was necessary to "carefully evaluate not only Mockett's proffered direct evidence of derivation, but the circumstances surrounding the alleged invention of the subject matter of this interference by both parties."

The Board noted that Mockett testified that he conceived of a grommet with a pivoting tab while attending a trade show with DMC's general manager, Sue Gordon, on June 14, 1990. The Board found that Mockett's testimony was corroborated by Gordon, who further testified that Mockett had sketched the pivoting-tab grommet for her on the airplane trip back to California. Thus, the Board said, "In view of Ms. Gordon's corroborating testimony, we credit junior party Mockett with a conception of the subject matter of the interference as of 14 June 1990. Furthermore, it is our view Ms. Gordon's testimony clearly establishes that the conception of Mockett was of subject matter within the scope of the count."

The Board next noted that Mockett testified that on June 19, 1990, he personally typed a letter to Plumley, then an independent sales agent for Jet Plastics, in which he described and sketched the grommet and asked Plumley to call him to get its production underway. The Board found, however, that the letter did not bear an address, and Mockett had testified at different times that the letter was sent to different addresses, several of which were incorrect. Thus, the Board concluded that Mockett had not shown, by a preponderance of the evidence, that he had communicated the grommet design to Plumley on June 19, 1990. Based on this conclusion, it did not reach Plumley's argument that the June 19 letter was fabricated. It explained: "We note that Plumley has argued that the [June 19, 1990] letter . . . is fabricated [citation]. We do not reach this issue, inasmuch as Mockett has not shown that it was mailed to the correct address. We have not credited it as establishing a communication anyway."

Mockett also testified that on June 21, 1990, he contacted Plumley by telephone and discussed the grommet with him. Plumley denied discussing the invention, however, and the Board found that the substance of the call was not corroborated. Mockett also testified that he (1) mailed a followup letter to Plumley on August 1 asking about progress toward getting a price quotation respecting the invention, (2) had conversations with Plumley about the invention sometime after August 1, again requesting a price quote, and (3) discussed his displeasure at not receiving a price quotation for the

invention with Lloyd Johnson, president of Jet Plastics. Mockett did not corroborate any of this testimony, however, and Plumley denied that the conversations occurred. Thus, the Board concluded that Mockett had "failed to establish, by a preponderance of the evidence, direct proof of communication of the conceived subject matter to senior party Plumley."

Notwithstanding its conclusion that Mockett failed to establish direct proof of communication, the Board held that "lack of direct proof of communication is not necessarily fatal to Mockett's claim of derivation. As noted above, derivation is rarely shown by direct proof." Thus, it looked to "[a]ll of the circumstances in the record" to evaluate the sufficiency of the communication. It found as follows:

(1) "The first significant probative element in Mockett's circumstantial case of derivation is the relative experience of the parties." "In this regard, the record establishes that Mockett had substantial experience in the furniture business. Mockett has designed several plastic parts for furniture and he holds several design patents therefor[]. Plumley stated that Mockett was not a designer, but we find no credible evidence that Mockett did not invent the patented designs. Mockett attends trade shows in search of new products and ideas, to analyze trends in the industry, and to obtain new customers. Mockett also employed a designer and held design contests to obtain new products." In contrast, "Plumley does not have substantial experience in the furniture business. Plumley has no furniture part design experience nor does he have design patents. His sole patent is the involved patent in this interference. He claims to have designed a wire handler, but that claim is disputed by the junior party . . . . There is no evidence that Plumley attended trade shows or had contact with customers in the furniture industry at the time alle[ged]ly he conceived the invention."

(2) "The second significant probative element in Mockett's circumstantial case of derivation is the testimony regarding recognition of the desire or need on the part of the furniture industry for the subject matter of the interference. As noted above, there is little credible evidence that Plumley had significant contact with the furniture industry. Given Plumley's limited contact with the furniture industry and Mockett's customers, Plumley has not made a credible showing of how he became aware of the desire in the industry for the subject matter of the count." Further, Plumley testified that during the relevant time he " '[n]ever heard of customers wanting a grommet that opened and closed at will' " and " '[n]ever heard about any grommet that could be opened and closed at will.' " In contrast, "Mockett stated that he was aware that some

customers desired a grommet having a cap which would cover the cord slot when not in use. Ms. Gordon also testified that customers desired a solution to this problem that had been discussed within the Mockett company for several years. In the cross-examination of Ms. Gordon, the subject was further elaborated. Ms. Gordon confirmed that it was a longstanding problem and desire of their customers for a cover to close the cord slot." Thus, the Board concluded: "We are of the view that the balance of the testimony . . . indicates an ignorance on the part of Plumley of the desire in the furniture industry for the subject matter of the interference. In view of Plumley's limited contact with the furniture industry and with the customers of Mockett and Company, we must infer some communication from Mockett to Plumley as to the need or desire in the furniture industry for a part embodying the interference subject matter. Otherwise, Plumley conceived the invention in a vacuum without knowledge of any problem the invention is designed to solve, an unlikely occurrence."

(3) The timing of Plumley's conception supported Mockett's claim. "According to Plumley, he conceived the invention just 5 days after Mockett withdrew as a customer of Jet Plastics. The proximity in time of these two actions is not likely to have been coincidental."

(4) Much of the remaining evidence was irrelevant to the issues before the Board. "[T]he record is replete with evidence that does not bear on the issue of derivation or is inconclusive. For example, the issue of the confidentiality agreement is not relevant to the question of conception or communication. Its only permissible purpose in the interference could be to reflect on the credibility of the witnesses. However, the testimony respecting this document is inconclusive." "Likewise, the balance of the testimony of the questioned document witnesses, Messrs. Riles, Weast, and Shwalbe, is entirely inconclusive and contradictory. We draw no conclusions from this testimony, and neither party has proved its claims respecting these documents by a preponderance of the evidence."

Thus, the Board concluded: "Taking the evidence presented in this interference as a whole and ignoring the evidence we have deemed not probative or inconclusive, we have determined that Mockett, the junior party, has established his case of derivation based on the circumstantial evidence." The Board entered judgment for Mockett, finding that he was entitled to the patent for the grommet.

After the *state court* appellate opinion became final, Plumley filed a motion for reconsideration of the Board's decision. The Board acknowledged the finality of the state court decision, but concluded that Plumley "has failed to show that our decision to give no weight or preclusive effect to the state court

decision was in error . . . . We remain convinced that our decision regarding whether we should follow a state court decision tangentially related to this interference is correct. We reiterated that by statute and decisions of our reviewing court we have original jurisdiction with respect to patent interferences. To the extent that the Notices Offering Official Records into Evidence can be construed as separate requests to change our original decision, they are DENIED."

### B. *The District Court's Reversal of the Board's Decision*

On July 29, 1998, Plumley filed a complaint pursuant to 35 United States Code section 146 to set aside the Board's decision.[5] Subsequently, he moved for summary judgment.

The district court granted summary judgment for Plumley on December 9, 1998. The court held that the Board correctly declined to give preclusive effect to the superior court's findings that Plumley invented the grommet and that Mockett was not credible, because those findings were not necessary to the superior court's decision. It explained: "[Mockett's state law claims] were predicated on Plumley having misappropriated what was allegedly Mockett's design idea. To support this allegation, Mockett presented evidence purporting to show that he communicated the grommet idea to Plumley. The state court found that this evidence was fabricated. The court's findings of fact that pertain to the inadequacy of Mockett's showing of communication of the grommet idea are necessary to the judgment for Plumley on the unfair business competition claims. However, any findings that go to Plumley himself being entitled to the grommet idea are surplusage. Because they were not necessary to the state court decision, we do not give them preclusive effect. [¶] Plaintiff also argues that we must give preclusive effect to the state court findings that go to Mockett's credibility, namely, the findings as to the fabrication of evidence supporting Mockett's allegation that he communicated the grommet idea to Plumley. The Board explicitly set aside Mockett's direct evidence of communication as inadequate and based its decision on circumstantial evidence that had no relation to Mockett's credibility."

---

[5] In relevant part, 35 United States Code section 146 provides: "Any party to an interference dissatisfied with the decision of the Board of Patent Appeals and Interferences on the interference, may have remedy by civil action, if commenced within such time after such decision, not less than sixty days . . . . In such suits the record in the Patent and Trademark Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony. The testimony and exhibits of the record in the Patent and Trademark Office when admitted shall have the same effect as if originally taken and produced in the suit. [¶] . . . Judgment of the court in favor of the right of an applicant to a patent shall authorize the Director to issue such patent on the filing in the Patent and Trademark Office of a certified copy of the judgment and on compliance with the requirements of law."

On the merits the court said that the Board erred in inferring that Mockett had communicated the design for the pivoting-tab grommet to Plumley based solely upon circumstantial evidence of (1) the relative experience of the parties, (2) their respective awareness of a need for the design in the furniture industry, and (3) the timing of Plumley's alleged conception. The court explained that while these facts might be helpful to supplement independent evidence of communication, they were not themselves evidence of communication. The court thus concluded that the Board found communication without an adequate evidentiary basis, and it ordered the Board's decision set aside. Judgment was entered on December 9, 1998.

Mockett moved to alter or amend the judgment. The district court ordered further briefing and, on June 4, 1999, it entered a final order. The order reaffirmed the court's conclusion that there was insufficient evidence of communication to establish derivation. However, it noted that the Board had not reached Mockett's alternative theory of priority of invention, and it remanded the case to the Board for a decision on that issue. An amended judgment was entered June 8, 1999.

Mockett appealed the district court order to the United States Court of Appeals for the Federal Circuit (Federal Circuit). On June 15, 2000, the Federal Circuit dismissed the appeal without prejudice because the Board had not yet addressed the issue of priority.

C. *The Board's Second Decision*

The Board issued a second decision in the interference action on September 4, 2001. The Board noted that the district court had not disturbed its legal conclusion that Mockett independently conceived the grommet before Plumley allegedly did so. However, because the district court had reversed its conclusion that Plumley derived the invention from Mockett, "for Mockett to prevail on priority of invention, Mockett must show either that he was first to reduce the invention to practice, or that he was diligent from just prior to the Plumley entry into the field until his own reduction to practice."

The Board concluded that Mockett had not established either prong. First, while Mockett established that he made a drawing and written description of the grommet before Plumley entered the field, the drawing was insufficient to evidence a reduction to practice. Second, Mockett failed to establish either that he took steps between January and August 1991 to reduce the invention to practice, or that he was excused from doing so. Thus, the Board concluded, "Mockett has not established by a preponderance of evidence that he was diligent from Plumley's entry into the field until Mockett's own reduction to practice. Consequently, Mockett has failed to antedate [Plumley's] effective filing date."

Mockett appealed the Board's decision to the Federal Circuit, which affirmed it on October 21, 2005.

## IV. *The Malicious Prosecution Action*

Plumley filed the present malicious prosecution action against Mockett and Astor on March 24, 2006. It alleged that Mockett and Astor filed the federal interference action with malice and without probable cause, and it sought compensatory and punitive damages. Mockett and Astor filed answers generally denying the allegations of the complaint.

Mockett and Astor filed special motions to strike under the anti-SLAPP statute. (§ 425.16.) They contended that (1) malicious prosecution actions are within the scope of the anti-SLAPP statute; and (2) Plumley could not demonstrate a probability of prevailing on his malicious prosecution claim because the Board's initial decision for Mockett conclusively established probable cause to bring the interference. Specifically, they argued that under California law, a malicious prosecution defendant's initial victory in the underlying case is conclusive proof of probable cause, even if that victory is subsequently overturned on appeal. They conceded that there is an exception to the general rule when the initial victory is procured by fraud, but asserted that the Board's decision specifically stated that it was not based on evidence that Judge Cooper found to have been fabricated. Moreover, they argued that independent of the Board's initial decision for Mockett, the evidence submitted in the patent proceedings established probable cause as a matter of law. Finally, Astor contended that Plumley's claim that Mockett fabricated documents had no bearing on Plumley's claim against him because Astor was entitled to rely on the information he received from Mockett.

Plumley opposed the motions to strike. He conceded that a malicious prosecution action may properly be tested by an anti-SLAPP motion, but contended that Mockett and Astor had not established probable cause as a matter of law. In this regard, he urged that Judge Cooper's findings were conclusive evidence that Mockett knew his claims in the patent action were untrue; there was evidence that Astor knew his client's claims were false; and evidence that Mockett and Astor knowingly advanced false claims is evidence of malice.

The court requested supplemental briefing and, on December 11, 2006, entered a final order denying the motions to strike. The court said that it could not determine whether the Board had relied on evidence that Judge Cooper found to have been falsified. It thus concluded that the policies of the anti-SLAPP statute "would not seem to be disserved by resolving doubts against . . . a party whom the Superior Court contemporaneously had found

falsified evidence that was also submitted to the Patent Board. This is especially true given that the anti-SLAPP procedure only requires 'minimal merit' so that arguably, an ambiguous Board decision is enough to raise a dispute as to conclusive probable cause." The court noted that by so observing, it was not commenting "as to how the malicious prosecution claim should be decided. The court is merely explaining why, based on the unique facts of this record, it does not believe that the anti-SLAPP statute—as interpreted by the Legislature and the case law—precludes Plumley from even trying to prove his claim." Further, it found that because the facts were in dispute as to whether Mockett fabricated some material evidence, "one can reasonably infer another dispute as to whether counsel knew of such fabrication as derived from investigation and discovery during long litigation. Further, there is some direct evidence in dispute as to counsel's knowledge . . . ."

Mockett and Astor timely appealed.

## DISCUSSION

### I. *The Anti-SLAPP Statute and the Standard of Review*

Section 425.16, the anti-SLAPP statute, provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

█ "Under this statute, the party moving to strike a cause of action has the initial burden to show that the cause of action 'aris[es] from [an] act . . . in furtherance of the [moving party's] right of petition or free speech.' ([§ 425.16, subd. (b)(1)]; *Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002)] 29 Cal.4th [53,] 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Once that burden is met, the burden shifts to the opposing party to demonstrate the 'probability that the plaintiff will prevail on the claim.' (Code Civ. Proc., § 425.16, subd. (b)(1); *Equilon, supra,* 29 Cal.4th at p. 67.) 'To satisfy this prong, the plaintiff must "state[] and substantiate[] a legally sufficient claim." [Citation.] "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " [Citation.]' (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741 [3 Cal.Rptr.3d 636, 74 P.3d 737], fn. omitted . . . .)" (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].)

The parties agree that this malicious prosecution action arises from acts in furtherance of defendants' right of petition or free speech. (E.g., *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at pp. 734–735 ["[B]y its terms, section 425.16 potentially may apply to every malicious prosecution action, because every such action arises from an underlying lawsuit, or petition to the judicial branch."].) Therefore, the issue on appeal is whether Plumley presented evidence in opposition to defendants' anti-SLAPP motions that, if believed by the trier of fact, would be sufficient to support a judgment in his favor. This question is one of law, and we review the trial court's decision de novo. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*), abrogated by statute on another point of law as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 545–550,[ 59 Cal.Rptr.3d 109].) In doing so, we "consider[] the pleadings and evidentiary submissions of both the plaintiff and the defendant ([Code Civ. Proc.,] § 425.16, subd. (b)(2)); though [we do] not *weigh* the credibility or comparative probative strength of competing evidence, [we will] grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson, supra,* at p. 821.)

## II. *Elements of Malicious Prosecution*

To establish a cause of action for malicious prosecution, a plaintiff must plead and prove that the underlying action was (1) commenced by or at the direction of the defendant and pursued to a legal termination in the plaintiff's favor; (2) brought without probable cause; and (3) initiated with malice. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676 [34 Cal.Rptr.2d 386, 881 P.2d 1083]; *Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 513–514 [8 Cal.Rptr.3d 584].) Probable cause is a legal question to be resolved by the court; malice is a factual question to be resolved by a jury. (*Wilson, supra,* 28 Cal.4th at p. 817; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 874 [254 Cal.Rptr. 336, 765 P.2d 498].)

Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. "[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]), i.e., probable cause exists if 'any reasonable attorney would have thought the claim tenable.' (*Sheldon Appel, supra,* [47 Cal.3d] at p. 886.) This rather lenient standard for bringing a civil action reflects 'the important public policy of avoiding the chilling of novel or debatable legal claims.' (*Id.* at p. 885.) Attorneys and litigants . . . ' "have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." '

(*Ibid.*, quoting *In re Marriage of Flaherty, supra*, at p. 650.) Only those actions that ' "any reasonable attorney would agree [are] totally and completely without merit" ' may form the basis for a malicious prosecution suit. (*Ibid.*)" (*Wilson, supra,* 28 Cal.4th at p. 817.)

Defendants concede the favorable termination element—i.e., that the interference was commenced by Mockett and resulted in judgment for Plumley. They contend, however, that Plumley failed to establish a prima facie case either of lack of probable cause or of malice. Plumley disagrees and contends that the superior court's findings in the state tort action conclusively negate a finding of probable cause. Alternatively, Plumley contends that (1) even if the superior court's findings do not conclusively establish lack of probable cause, they are prima facie evidence of lack of probable cause; (2) Astor's own testimony proved that he prosecuted the interference with knowledge that Mockett's claims were false; and (3) the same facts that support a finding of lack of probable cause also support a finding of malice.

As we now explain, on the entire record we find that Plumley failed to make a prima facie showing that Mockett lacked probable cause to bring the interference action. We therefore conclude that the trial court erred in denying the anti-SLAPP motion. Because it is unnecessary to our decision, we do not reach the parties' contentions regarding malice.

III. *The Superior Court's Findings Do Not Conclusively Establish Lack of Probable Cause to Initiate the Interference*

Plumley contends that Judge Cooper's findings in the state tort action conclusively demonstrate the absence of probable cause to bring the interference action because (1) they are entitled to collateral estoppel effect here, and (2) they were the subject of an unopposed request for judicial notice in the trial court. For the reasons that follow, we disagree.

A. *Collateral Estoppel*

Plumley contends that Judge Cooper "expressly found that the entirety of Mockett's story—where and how he got the idea for a pivoting tab grommet, who thought of it first, and whether Mockett ever communicated it to Plumley—was completely and utterly false." These findings, he says, are entitled to collateral estoppel effect here and, therefore, are dispositive of the legal question of probable cause to bring the interference because no reasonable person "would think tenable a claim based upon false evidence and false testimony."

We do not agree. "Collateral estoppel precludes the relitigation of an issue only if (1) the issue is identical to an issue decided in a prior

proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding is final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].)" (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82 [70 Cal.Rptr.3d 817].)

Here, while Plumley contends that Mockett's claims in the state court action are identical to his claims *in the interference,* he makes absolutely no showing Mockett's state court claims are "identical" to those to be litigated *here.* Moreover, they are facially distinguishable: The issue in the state court action was whether Plumley misappropriated Mockett's invention; the issue here is whether Mockett had reasonable cause to believe he did so. Plumley thus fails to make the necessary showing from which we could conclude that Judge Cooper's findings are entitled to collateral estoppel effect in the present action.

Moreover, even if all the traditional elements of collateral estoppel were met, courts still look "to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting." (*Lucido v. Superior Court, supra,* 51 Cal.3d at pp. 342–343.) "[T]he public policies underlying collateral estoppel—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy." (*Id.* at p. 343.)

█ Applying collateral estoppel in the present case would not preserve the integrity of the judicial system, promote judicial economy, or protect against vexatious litigation. To the contrary, doing so would violate well-established principles that litigants and attorneys who bring a legally tenable action are not subject to liability for malicious prosecution simply because a trier of fact disbelieves their version of conflicting evidence and makes findings adverse to them. As our Supreme Court has said concerning the scope of liability for malicious prosecution, "[a] litigant or attorney who possesses competent evidence to substantiate a legally cognizable claim for relief does not act tortiously by bringing the claim, even if also aware of evidence that will weigh against the claim. Plaintiffs and their attorneys are not required, on penalty of tort liability, to attempt to predict how a trier of fact will weigh the competing evidence, or to abandon their claim if they think it likely the evidence will ultimately weigh against them. They have the right to bring a claim they think unlikely to succeed, so long as it is arguably meritorious. [Citation.]" (*Wilson, supra,* 28 Cal.4th at p. 822, fn. omitted.)

Applying collateral estoppel in the present case would fundamentally undermine our public policy of permitting parties to pursue nonfrivolous litigation without facing subsequent liability for malicious prosecution. Indeed, if the state court's findings were given collateral estoppel effect, Plumley effectively would be relieved of his burden to prove that Mockett lacked probable cause, and Mockett would be deprived the opportunity to prove that, in fact, he did have probable cause.[6] We thus reject Plumley's contention that Judge Cooper's findings are entitled to collateral estoppel effect.

### B. *Judicial Notice*

 We also reject Plumley's contention that Judge Cooper's findings must be "received *and credited*" because appellants waived all objections to his request for judicial notice of those findings. (Italics added.) "While we have no quarrel with the fact that a judge, after hearing a factual dispute between litigants A and B, may choose to believe A, and make a finding of fact in A's favor, and while we have no quarrel that at some subsequent time it may be proper to take judicial notice *that the judge did in fact make that particular finding* in favor of A, the taking of judicial notice that the judge *made* a particular factual finding is a far cry from the taking of judicial notice that the 'facts' found by the judge must necessarily be the true facts, i.e., must necessarily be 'the truth.' To state this a bit more simply, the taking of judicial notice that the judge believed A (i.e., that the judge ruled in favor of A on a particular factual dispute) is different from the taking of judicial notice that A's testimony must necessarily have been true simply because the judge believed A and not B." (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1565 [8 Cal.Rptr.2d 552].)[7]

Indeed, Plumley's contention that Judge Cooper's findings must be credited simply because they were judicially noticed "appears to improperly

---

[6] We note that a necessary implication of Plumley's collateral estoppel argument is that once Plumley secured a favorable decision in the state proceeding, there could *never* have been probable cause to pursue the federal interference action—even if, as the Board and the district court found, the state findings were not preclusive in the federal suit. That cannot be the case. That is, if findings in a first action are not preclusive in a second action, by definition they do not constrain plaintiff's proof in any way. They thus cannot render a plaintiff's claim lacking in probable cause.

[7] "It appears to us . . . that neither a finding of fact made after a contested adversary hearing nor a finding of fact made after any other type of hearing can be indisputably deemed to have been a correct finding. As we have noted, '[u]nder the doctrine of judicial notice, certain matters are assumed to be indisputably true, and the introduction of evidence to prove them will not be required.' (1 Witkin, Cal. Evidence (3d ed. 1986) § 80.) Taking judicial notice of the truth of a judge's factual finding would appear to us to be tantamount to taking judicial notice that the judge's factual finding must necessarily have been correct and that the judge is therefore infallible. We resist the temptation to do so." (*Sosinsky v. Grant, supra,* 6 Cal.App.4th at p. 1568.)

merge the doctrine of judicial notice with the doctrines of res judicata and collateral estoppel." (*Sosinsky v. Grant, supra,* 6 Cal.App.4th at p. 1569.) "It is the consequence of judicial notice that the 'fact' noticed is, in effect, treated as true for purposes of proof. 'Under the doctrine of judicial notice, certain matters are assumed to be indisputably true, and the introduction of evidence to prove them will not be required. Judicial notice is thus a substitute for formal proof. [Citation.]' (1 Witkin, Cal. Evidence (3d ed. 1986) § 80, p. 74.) Therefore, a finding of fact that was judicially noticed would be removed as a subject of dispute and would be accepted for evidentiary purposes as true. *The effect would be that without resort to concepts of collateral estoppel or res judicata that would litigate whether the issue was fully addressed and resolved, a finding of fact would be removed from dispute in the other action in which it was judicially noticed.*" (*Sosinsky, supra,* at p. 1564, italics added.)

In sum, while the trial court was entitled to take judicial notice of Judge Cooper's findings, it could "credit" them—i.e., accord them preclusive effect in this proceeding—only if the elements of collateral estoppel were satisfied. We have already concluded that Plumley has failed to show that they were. By failing to object to Plumley's request for judicial notice, thus, Mockett and Astor forfeited any contention that Judge Cooper's findings should not have been *admitted,* but not that they should not have been *credited.*

### IV. *Mockett's Victory Before the Board, Though Reversed on Appeal, Conclusively Establishes Probable Cause to Initiate the Interference*

Plumley next contends that even if Judge Cooper's findings are not *conclusive* evidence of lack of probable cause, those findings and the evidence on which they were based are, at a minimum, *prima facie* evidence of lack of probable cause. He concedes, as he must, that an interim victory, even if reversed on appeal, generally establishes probable cause as a matter of law. He asserts, however, that that rule is trumped where the victory was procured by fraud, false evidence, or perjury. Because the parties dispute whether Mockett's initial victory before the Board was based on fraud or perjury, Plumley contends that probable cause cannot be decided as a matter of law, but must instead be resolved by a jury. Specifically, he says that Judge Cooper's findings are prima facie evidence that Mockett's initial victory before the Board was based on Mockett's fraudulent testimony that he (1) was the first to conceive of the pivoting-tab grommet; (2) independently conceived the pivoting-tab grommet; and (3) communicated his idea to Plumley. Thus, Plumley contends, the findings in the state court action are more than sufficient to meet his burden of establishing a probability of prevailing in the present malicious prosecution action.

We do not agree. Implicit in Plumley's contention is that any allegation of fraud or perjury—even one already considered *and rejected* by a trier of fact—is sufficient to overcome an interim adverse judgment. For the reasons that follow, we disagree and hold that where, as here, claims of fraud or perjury are litigated unsuccessfully before a fact finder in an underlying case, those same claims cannot be relied on to establish the absence of probable cause in a subsequent malicious prosecution suit.

## A. *The Interim Adverse Judgment Rule*

██ California courts have held that victory at trial, though reversed on appeal, conclusively establishes probable cause to bring the underlying action. (*Wilson, supra,* 28 Cal.4th at p. 817, citing *Bealmear v. So. Cal. Edison Co.* (1943) 22 Cal.2d 337, 340 [139 P.2d 20]; *Carpenter v. Sibley* (1908) 153 Cal. 215, 218 [94 P. 879]; *Holliday v. Holliday* (1898) 123 Cal. 26, 32 [55 P. 703]; *Cowles v. Carter* (1981) 115 Cal.App.3d 350, 356, 359 [171 Cal.Rptr. 269]; *Fairchild v. Adams* (1959) 170 Cal.App.2d 10, 15 [338 P.2d 191]; see also *Crescent Live Stock Co. v. Butchers' Union* (1887) 120 U.S. 141, 149–151 [30 L.Ed. 614, 7 S.Ct. 472].) "The rationale is that approval by the trier of fact, after a full adversary hearing, sufficiently demonstrates that an action was legally tenable. (*Cowles, supra,* at p. 358.) To put it differently, success at trial shows that the suit was not among the least meritorious of meritless suits, those which are totally meritless and thus lack probable cause." (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 383 [90 Cal.Rptr.2d 408].) "Because malicious prosecution suits have the potential to penalize and deter the legitimate invocation of the judicial process for redress of grievances, only claims that a reasonable litigant or attorney would have seen as lacking all merit should form the basis for such a suit. Claims that have succeeded at a hearing on the merits, even if that result is subsequently reversed by the trial or appellate court, are not so lacking in potential merit that a reasonable attorney or litigant would necessarily have recognized their frivolousness." (*Wilson, supra,* 28 Cal.4th at pp. 817–818.)[8]

---

[8] Another rationale, articulated by the United States Supreme Court, is as follows: "[T]he rule in question, which declares that the judgment or decree of a court having jurisdiction of the parties and of the subject-matter, in favor of the plaintiff, is sufficient evidence of probable cause for its institution, although subsequently reversed by an appellate tribunal, was not established out of any special regard to the person of the party . . . . [It] is founded on deeper grounds of public policy in vindication of the dignity and authority of judicial tribunals constituted for the purpose of administering justice according to law, and in order that their judgments and decrees may be invested with that force and sanctity which shall be a shield and protection to all parties and persons in privity with them. The rule, therefore, has respect to the court and to its judgment, and not to the parties . . . ." (*Crescent Live Stock Co. v. Butchers' Union, supra,* 120 U.S. at p. 159, quoted in *Bullock v. Morrison* (1931) 118 Cal.App. 112, 114 [4 P.2d 812], and *Carpenter v. Sibley* (1911) 15 Cal.App. 589, 601–602 [119 P. 391].)

This presumption—referred to by some authorities as the "interim adverse judgment" rule—is subject to an exception where the underlying victory was obtained by fraud or perjury. Our Supreme Court has explained: "[I]f a man has procured an unjust judgment by the knowing use of false and perjured testimony, he has perpetrated a great private wrong against his adversary . . . . So we find it laid down that the general rule now is, 'that if the declaration or complaint shows a conviction of the plaintiff, yet if it be averred that the conviction was procured by fraud, perjury or subornation of perjury, or other unfair conduct on the part of the defendant, the presumption of probable cause is effectually rebutted.' [Citations.]" (*Carpenter v. Sibley, supra,* 153 Cal. at p. 218; see also *Wilson, supra,* 28 Cal.4th at p. 817 ["decisions in California and elsewhere established that a trial court judgment or verdict in favor of the plaintiff or prosecutor in the underlying case, *unless obtained by means of fraud or perjury,* establishes probable cause to bring the underlying action, even though the judgment or verdict is overturned on appeal or by later ruling of the trial court" (italics added)]; *Bergman v. Drum* (2005) 129 Cal.App.4th 11, 21 [28 Cal.Rptr.3d 112] ["It is the law in California that a plaintiff's victory at trial (*unless it is obtained by means of fraud or perjury*) will act as conclusive proof that there was probable cause for the plaintiff to file the suit . . . even if the victory is reversed . . . ." (italics added)]; *Roberts v. Sentry Life Insurance, supra,* 76 Cal.App.4th at p. 384 ["[I]f denial of summary judgment was induced by materially false facts submitted in opposition, equating denial with probable cause might be wrong. Summary judgment might have been granted but for the false evidence."]; Rest.2d Torts, § 667(1) ["The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means."].)

Plumley contends that Judge Cooper's findings and the evidence on which they were based are prima facie evidence that Mockett's interim victory before the Board was procured by fraud and, thus, that Mockett is not entitled to the shield of the interim adverse judgment rule. This contention, however, presupposes that Plumley is entitled to relitigate the fraud issue already resolved—albeit in fundamentally different ways—in the state tort action and the interference proceeding. For the reasons that follow, we conclude that he is not.

### B. *The Fraud Exception to the Interim Adverse Judgment Rule*

Although the fraud exception to the interim adverse judgment rule has been a feature of California law for more than a century (see *Carpenter v. Sibley, supra,* 153 Cal. at p. 218; *Holliday v. Holliday, supra,* 123 Cal. at p. 32), few courts have had occasion to apply it. (E.g., *White v. Lieberman*

(2002) 103 Cal.App.4th 210, 219 [126 Cal.Rptr.2d 608] ["None of the allegations of the complaint leads to the conclusion that Judge Lloyd's decision was obtained through fraud."]; *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 357 [125 Cal.Rptr.2d 383] ["No evidence has been presented that the trial court's ruling was obtained by fraud or perjury."]; *Wilson, supra,* 28 Cal.4th at p. 826 ["Plaintiffs in the present malicious prosecution action have not attempted to show that that ruling was obtained by fraud or perjured testimony."].) More significantly for our purposes, *none* has done so in circumstances analogous to the present one, where the fraud alleged to bring the case within the exception to the interim adverse judgment rule was presented and rejected by the trier of fact.[9]

Courts of other states have considered this question, however, concluding that once allegations of fraud or perjury have been rejected by a trier of fact, they cannot be resurrected in a subsequent malicious prosecution action to avoid the interim adverse judgment rule. In *Hanson v. Snohomish* (1993) 121 Wn.2d 552 [852 P.2d 295], for example, the appellant was convicted of first degree assault. He appealed his conviction, arguing, in part, that the trial court should have suppressed the victim's identification because the procedures used by the investigating police officers were impermissibly suggestive. (*Id.,* 852 P.2d at p. 296.) The appellate court held that the identification evidence was properly admitted, but it reversed and ordered a new trial on other grounds. (*Ibid.*) The appellant was acquitted on remand. (*Ibid.*) Following his acquittal, appellant sued the city and its police chief for malicious prosecution. (*Ibid.*) The trial court granted summary judgment for the defendants, and the Supreme Court affirmed. (*Id.,* at p. 297.) Citing the interim adverse judgment rule, it held that even if later reversed, the appellant's initial conviction was conclusive evidence of probable cause unless it was obtained by fraud, perjury, or other corrupt means. (*Id.,* at pp. 297–300.) Further, it held that because the propriety of the identification procedures— which it characterized as "the only allegations that could even possibly support a claim of fraud, perjury or corrupt practices" (*id.,* at p. 300)—had been decided against him in the criminal proceeding, the appellant could not raise them here. It explained: "Hanson alleges here, as he did in the criminal proceeding, that the investigating police officers used impermissibly suggestive methods for identifying the assailant of the assault

_____

[9] As relevant to this issue, Plumley cites *Zamos v. Stroud, supra,* 32 Cal.4th 958, for the proposition that "the Supreme Court affirmed the reversal of the trial court's grant of an anti-SLAPP motion, noting, among other things, that the Court of Appeal deemed a direct conflict in two parties' evidence sufficient to trigger the 'procured by fraud' exception to the rule that a prior adjudication in the defendants' favor establishes the existence of probable cause." This summary accurately states the holding of the Court of Appeal, but it has no relevance here: The Supreme Court expressly stated that because the defendants did not petition for review on this issue, "*we need not decide* whether the Court of Appeal correctly decided it." (*Id.* at p. 973, fn. 10, italics added.)

victim. Specifically, Hanson alleges the police manipulated the composite drawing, the photographic montage and the videotape lineup. These arguments are the same arguments Hanson made to the trial court at the pretrial suppression hearing and to the Court of Appeals on appeal from his conviction. In each court, Hanson was unsuccessful. *He may not now relitigate this issue in this related civil case." (Ibid.*, italics added.)

The court reached a similar conclusion in *Haygood v. Boothby Realty Company* (1961) 272 Ala. 95 [128 So.2d 497]. There, a landlord sued its tenant for nonpayment of rent. (*Id.*, 128 So.2d at p. 500.) The trial court initially entered judgment for the landlord; after an appeal and new trial, judgment was entered for the tenant. (*Ibid.*) The tenant then filed an action for malicious prosecution, in which she asserted that the landlord's initial victory in the rent case was obtained through fraudulent testimony. (*Id.*, at p. 501.) The trial court sustained the landlord's demurrer, and the Alabama Supreme Court affirmed. (*Ibid.*) It explained that the tenant's claim of fraud was "based on the alleged untruthfulness of the testimony of James H. Roberts, Vice-President of Boothby Realty Company, a corporation. In the Municipal Court his testimony was given credibility. On the trial de novo in the Circuit Court his testimony was apparently not believed. *But the credibility of his testimony was a matter which was presented and considered in the trial of those cases." (Id.*, at p. 503, italics added.) Thus, the court said, because the veracity of Roberts's testimony had already been evaluated by two juries in the underlying case, it could not be relied upon to avoid the conclusive presumption of probable cause created by the landlord's initial victory. (*Ibid.*)

We believe that these cases articulate the correct rule. The California Supreme Court has said that " '[e]ndless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice . . . .' (*Pico v. Cohn* (1891) 91 Cal. 129, 134 [27 P. 537]; accord, *United States v. Throckmorton* (1878) 98 U.S. 61, 68–69 [25 L.Ed. 93]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11 [74 Cal.Rptr.2d 248, 954 P.2d 511].)" (*People v. DeLouize* (2004) 32 Cal.4th 1223, 1232 [13 Cal.Rptr.3d 302, 89 P.3d 733].) Thus, "the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. (*Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 640–641 [99 Cal.Rptr. 393]; see also *Pico v. Cohn*[, *supra,*] 91 Cal. 129.)" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365].) "For our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings. To allow a

litigant to attack the integrity of evidence after the proceedings have concluded, except in the most narrowly circumscribed situations, such as extrinsic fraud, would impermissibly burden, if not inundate, our justice system." (*Ibid.*)

In view of the Supreme Court's vindication of the need for finality, we conclude that where claims of fraud or perjury are litigated and rejected by a fact finder in an underlying case, those same claims cannot be relied on to establish the absence of probable cause in a subsequent malicious prosecution suit. Stated differently, one cannot relitigate adversely decided factual matters for purposes of establishing the fraud exception to the interim adverse judgment rule.[10]

█ Applying this rule to the present case, we conclude that the Board's initial findings are dispositive of Plumley's fraud allegation here. To avoid the application of the interim adverse judgment rule in this case, Plumley has asserted that Mockett's victory in the interference suit was based on fraudulent testimony that Mockett was the first to conceive of the grommet and that he communicated the idea to Plumley. But Plumley urged this very same fraud theory before the Board in the underlying case, and the Board rejected it. It thus cannot give rise to a triable issue of fact as to whether Mockett had probable cause to bring the underlying case.

V. *Plumley Fails to Make a Prima Facie Showing That Mockett Lacked Probable Cause to Pursue His Alternative Theory of "Priority"*

Mockett pursued two theories before the Board: "derivation" and "priority." Plumley asserts that while Mockett enjoyed an initial victory before the

---

[10] In view of the Supreme Court's modern decisions on other issues, we question whether the holding of *Carpenter v. Sibley, supra*, 153 Cal. 215, that either extrinsic *or intrinsic* fraud may be relied on to avoid the interim adverse judgment rule, remains good law. (*Id.* at pp. 217–218 ["Respondents then argue that the only fraud which will avail the plaintiff to overcome the presumption of probable cause established by the conviction is extrinsic fraud which would justify an action to set aside the judgment. Here respondents fall into error . . . . Certainly if a man has procured an unjust judgment by the knowing use of false and perjured testimony, he has perpetrated a great private wrong against his adversary. If that judgment is in the form of a judgment of criminal conviction, it would be obnoxious to every one's sense of right and justice to say that because the infamy had been successful to the result of a conviction, the probable cause for the prosecution was thus conclusively established against a man who had thus been doubly wronged. Therefore, while it may be true, that the fraud alleged in this complaint is not such a fraud as would support an action for the setting aside of a judgment, it is still a fraud which will support an action for a remedy for the private wrong thus committed."].) But while we note this issue, we need not resolve it, because in the present case the alleged intrinsic fraud was litigated in the earlier proceeding.

Board on derivation, "he does not have even a short-lived interim victory to point to as evidence of probable cause" to pursue his priority claim. Further, he says, the Board found that Mockett's priority claim was legally untenable, concluding that Mockett cited no authority to suggest that describing and drawing the grommet constituted a "reduction to practice" and that his evidence of excuse was " 'devoid of specific facts' " and " 'insufficient to show either reasonably continuous activity or a reasonably continuous excuse.' " Thus, Plumley contends, even if Mockett had probable cause to pursue a theory of derivation, he lacked probable cause to pursue his alternative theory of priority.

We assume for the sake of argument that Plumley is correct that, although Mockett asserted just one "count" in his interference complaint, he can be liable for malicious prosecution if he lacked probable cause of *either* "derivation" or "priority."[11] Nonetheless, we conclude that the Board's findings do not support a conclusion that Mockett's priority claim lacked probable cause.

In *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th 728, the Supreme Court considered whether findings in an underlying case, alone, can support a finding of no probable cause in a subsequent malicious prosecution action. There, Jarrow, a manufacturer, engaged LaMarche, a graphic designer, to design labels for its products. A dispute arose about the ownership of certain artwork, and Jarrow sued LaMarche for rescission and fraud. LaMarche cross-complained. Jarrow obtained a summary judgment and dismissal of the cross-complaint. In its order granting summary judgment, the trial court stated that " 'no competent evidence' " of harmful activity by Jarrow or damages to LaMarche's business had been presented. (*Id.* at p. 742.)

Jarrow then sued LaMarche for malicious prosecution. LaMarche moved to strike Jarrow's malicious prosecution complaint pursuant to section 425.16, and the Court of Appeal directed the trial court to grant the motion. Jarrow sought review, contending that the anti-SLAPP motion should have been granted because, among other things, the summary judgment ruling and findings in the underlying case should have been deemed to satisfy its burden

---

[11] Plumley asserts in this regard as follows: "The count is the Board's statement of the overlap between the two patents or between the patent and the patent application at issue. The count does not state the legal basis, like a state court cause of action, for awarding relief . . . . Thus, the invention at issue is defined by the count. In contrast, the two theories advanced by Mockett—derivation and priority—are the legal bases upon which Mockett sought the relief of having the patent taken from Plumley and awarded to Mockett. They correspond to 'counts' or 'theories' in state court practice."

under the statute to show a probability of prevailing on the merits. The court disagreed. It explained that contrary to Jarrow's assertion, the entry of summary judgment for the defense on an underlying claim on grounds of insufficient evidence does not establish that the litigant "necessarily can 'state[] and substantiate[]' (*Rosenthal* v. *Great Western Fin. Securities [Corp.* (1996) 14 Cal.4th 394,] 412 [58 Cal.Rptr.2d 875, 926 P.2d 1061]) a subsequent malicious prosecution claim." (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 742.) "Plainly, a claim that appears 'arguably correct' or 'tenable' when filed with the court may nevertheless fail, as LaMarche's did, for reasons having to do with the sufficiency of the evidence actually adduced as the litigation unfolds. As defendants point out, every case litigated to a conclusion has a losing party, but that does not mean the losing position was not arguably meritorious when it was pled. (*Wilson, supra,* 28 Cal.4th at p. 824.) And just as an action that ultimately proves nonmeritorious may have been brought with probable cause, successfully defending a lawsuit does not establish that the suit was brought without probable cause." (*Jarrow, supra,* at pp. 742–743, fn. omitted.) Thus, the court concluded, having obtained summary judgment on the cross-complaint in the underlying litigation did not satisfy Jarrow's burden of proof under section 425.16. (*Jarrow,* at p. 743.)

The principles articulated in *Jarrow* control here. Plumley has not cited us to any evidence that would establish absence of reasonable diligence or excuse; instead, he relies on the Board's findings that Mockett's evidence was "devoid of specific facts" and "insufficient" to argue that "no reasonable lawyer would think evidence of excuse that was *devoid of specific facts* constitutes a tenable claim." But that is not enough: If lack of probable cause is not established even by entry of summary judgment in the underlying case—i.e., by a court's conclusion that there "is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (§ 437c, subd. (c))—then it necessarily is not established by findings, after a full trial, that plaintiff's evidence was not specific enough to prove his claims by a preponderance of the evidence. We thus conclude that Plumley has not demonstrated a prima facie case that Mockett lacked probable cause to pursue a claim of priority.

VI. *Plumley's Evidence Does Not Establish That Astor Prosecuted the Interference with Knowledge That Mockett's Claims Were False*

Plumley contends finally that Astor's testimony in the state tort action establishes that Astor prosecuted the interference with knowledge that Mockett's claims were false and, thus, is a sufficient ground on which to deny the motions. Specifically, Plumley relies on Astor's testimony in state court about a letter he sent to Plumley's patent attorney, Carl Kustin, to which he

attached the purported June 19 and August 1, 1990 letters. Astor's testimony is as follows:

"Q. This letter [to Mr. Kustin] has attached to it as exhibits a copy of what we now know to be the June 19 and August 1 letters that Mr. Plumley contends—I'm sorry—Mr. Mockett contends he sent to Mr. Plumley, correct?

"A. Yes.

"Q. Is it true that the copies of the letters that you sent to Mr. Kustin under cover of your letter of April 28, 1993, had the dates redacted—a fancy lawyer word for 'covered up'—so Mr. Plumley's lawyer[,] Mr. Kustin[,] couldn't see the dates on those two letters?

"A. Yes, that's true. That's because of the interference proceeding.

"Q. Is it true the reason you covered up the dates was because you believed Mr. Plumley would obtain an advantage in connection with certain filings in the patent office if he knew the dates on those letters?

"A. Yes.

"Q. Those dates are filed in the patent office secretly?

"A. That it [*sic*] true."

Plumley contends that this testimony is evidence that Astor knew Mockett's claims were false because Astor would have redacted the relevant dates only if he knew that Mockett had never sent them to Plumley. He explains: "If the June and August letters were genuine, they would have been sent to Plumley, and Plumley would have known their dates. If Astor believed the letters were genuine, he would have had no reason to redact the dates."

We do not agree that this testimony is sufficient to sustain a finding that Astor believed Mockett's claims to be false. Nothing in the testimony directly establishes that Astor knew or suspected that Mockett had not sent the letters to Plumley. Nor does the testimony compel this inference. To the contrary, as Astor suggests, an equally reasonable inference is that Astor did not know whether Plumley still had the letters or recalled the dates on which he received them; if not, Astor would not have wanted to provide Plumley with that information because it was critical to establishing priority of invention. Astor's ambiguous testimony is too slender a reed to support the conclusion that Astor knew Mockett's testimony to be false.

## DISPOSITION

The order denying defendants' special motions to strike under section 425.16 is reversed. The matter is remanded to the trial court with directions to grant defendants' special motions to strike and to enter judgment for defendants. Defendants shall recover their costs on appeal.

Epstein, P. J., and Manella, J., concurred.