Filed 8/27/14

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| WILLIAM PARRISH et al., | B244841 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC482394) |
| v. | |
| LATHAM & WATKINS et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County,

James R. Dunn, Judge.  Reversed.

Eagan Avenatti, Michael J. Avenatti and Scott H. Sims; Panish, Shea & Boyle,

Brian J. Panish, Adam K. Shea and Kevin R. Boyle; Esner, Chang & Boyer and

Stuart B. Esner for Plaintiffs and Appellants.

McKool Smith Hennigan, J. Michael Hennigan and Michael Swartz for

Defendants and Respondents.

In a prior litigation, FLIR Systems, Inc. and Indigo Systems Corporation (collectively, FLIR) brought suit against their former employees, William Parrish and E. Timothy Fitzgibbons (collectively, Former Employees) for, among other things, misappropriation of trade secrets (the underlying action). Former Employees were successful in defeating the underlying action. Moreover, they obtained a ruling that the misappropriation of trade secrets claim had been brought against them in bad faith, which resulted in an order that FLIR pay Former Employees their attorney fees and costs (Civ. Code, § 3426.4) in an amount exceeding $1.6 million. That order was affirmed on appeal. (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1274.) Thereafter, Former Employees brought the instant malicious prosecution action against the attorneys who had represented FLIR in the underlying action, Latham & Watkins LLP, and Attorney Daniel Schecter (collectively Latham). Latham moved to strike the complaint under Code of Civil Procedure section 425.16, the so-called anti-SLAPP statute.[1] The motion was granted on the basis that Former Employees were unable to establish a probability of prevailing on their malicious prosecution action, because the action was untimely brought under Code of Civil Procedure section 340.6. Former Employees appeal, arguing that Code of Civil Procedure section 340.6 is not the appropriate statute of limitations for a malicious prosecution action, and that they have

---

[1]    SLAPP is an acronym for "strategic lawsuits against public participation." (*Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 309, fn. 1.)

2

presented sufficient evidence that they otherwise have a probability of prevailing. We

agree and reverse.[*]

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Underlying Facts*

The trade secrets at issue involve the manufacture of a type of microbolometer,

which is a device for detecting infrared radiation, used in connection with infrared

cameras, night vision and thermal imaging. Specifically, the case involves the

manufacture of "uncooled, TEC-less, vanadium oxide microbolometers."[2]

Former Employees were shareholders and officers of Indigo, which was in the

microbolometer business. In 2004, FLIR acquired Indigo, acquiring, among other

things, Indigo's intellectual property. Former Employees continued to work for Indigo

(and, therefore, FLIR). Former Employees left the employ of FLIR on January 6, 2006,

when their contracts expired. In 2004, while working for FLIR, Former Employees had

presented FLIR with a business plan involving outsourcing the manufacture of

microbolometers. When they left FLIR, Former Employees embarked on a business

plan for a new business which was, allegedly, similar to the business plan they had

---

[*]     Due to the unavailability of the third member of the panel which heard this
matter, this opinion is being filed with the concurrence of the two remaining members
of the panel. (Cal. Const., art. VI, § 3 ["Concurrence of 2 judges present at the
argument is necessary for a judgment"]; see, e.g., *People v. Castellano* (1978)
79 Cal.App.3d 844, 862.)

[2]     The record on the instant appeal does not entirely explain these terms. It appears
that "TEC" refers to thermoelectric cooler, so the microbolometers in question operate
without thermoelectric cooling components which, it is assumed, makes them less
expensive than microbolometers which are thermoelectrically cooled.

3

presented to FLIR. FLIR believed that the business plan which had been presented to it by Former Employees during their employment was, in fact, FLIR's intellectual property, and therefore could not be misappropriated by Former Employees for their own business purposes. FLIR also believed that the business envisioned by the business plan relied on intellectual property which belonged to FLIR.

FLIR and Former Employees had several meetings, in which Former Employees attempted to assure FLIR that they had no intention of using FLIR's intellectual property in their new business venture. They also explained to FLIR that the business plan they were using had been created by Former Employee Fitzgibbons *before he had even joined Indigo*, and was therefore not FLIR's intellectual property.

2.   *The Underlying Action is Filed by Latham*

On June 15, 2006, FLIR, represented by Latham, filed the underlying action against Former Employees, alleging seven causes of action, including misappropriation of trade secrets. That cause of action alleged, on information and belief, that Former Employees had been soliciting venture capital for their new business by presenting a business plan which misappropriated FLIR's confidential information and trade secrets.[3] The complaint alleged that Former Employees had "sought to assuage FLIR's concerns, by representing that they would not use any of . . . FLIR's confidential trade secrets, would license intellectual property from established owners, [and] would develop a 'rigorous IP filtering procedure.' These assurances were belied by

---

[3]   The complaint also alleged that, as a result of this misappropriation, FLIR had suffered actual damages. FLIR had not, in fact, suffered any damages.

4

Fitzgibbons'[s] claim that he had conceived the idea for the new business before joining Indigo, even though he had joined the company seven years earlier in 1999."

      3.      *Latham Changes the Theory of the Case*

By the time the underlying action was filed, Former Employees were deep in negotiations with a third party, Raytheon, to proceed on a new business venture. The business venture would involve Former Employees obtaining licenses for Raytheon's intellectual property in the area of microbolometer manufacture. It is not entirely clear from the record how similar the anticipated business venture with Raytheon was to the business plan which formed the basis of the complaint in the underlying action.[4] In any event, once Raytheon learned of the underlying action, it broke off all further negotiations with Former Employees.

Letters were exchanged between counsel for Former Employees and Latham. On July 16, 2006, Former Employees sought to prove to Latham that their business plan had, in fact, been formulated by Fitzgibbons prior to joining Indigo, by sending Latham a copy of the business plan which Fitzgibbons had submitted to another third party (Boeing), prior to joining Indigo. Counsel for former employees confirmed to Latham that their then-current business plan did not involve the use of FLIR's intellectual property but, instead, depended on licensing the necessary intellectual property from

---

[4]    The record includes various communications between Former Employees and Raytheon. It is clear from these communications that Former Employees and Raytheon were in the process of negotiating the terms of a business venture which was hoped to be mutually beneficial to them both. Former Employees had not presented Raytheon with their business plan on a take-it-or-leave-it basis.

a third party. By letter of August 15, 2006, counsel for Former Employees explained to Latham that Former Employees intended to license a complete technology package, including microbolometer fabrication techniques, from a major aerospace company. By letter of September 5, 2006, counsel for Former Employees identified the third party as Raytheon, and pointed out that Raytheon had been in the industry longer than FLIR or Indigo.

By letter of October 12, 2006, Latham responded to the revelation of Raytheon as the third party in question. Latham stated, "We note [Former Employees'] contention that the Raytheon technology package provides all the needed intellectual property and know-how for [Former Employees] to engage in high-volume production of [vanadium oxide] microbolometers. While that may be the case, it begs two critical questions related to FLIR's intellectual property." First, Latham asked if the "Raytheon package include[s] a design for TEC-less operation," because FLIR possessed some patents and trade secrets in this area.[5] Second, Latham asked how long it would take Former Employees "to achieve a viable design and production process" for the TEC-less vanadium oxide microbolometers *without* relying on FLIR's trade secrets. Latham stated that it was informed that Raytheon did not have a then-viable design, and

---

[5] It must be emphasized that at no time did FLIR ever suggest it held a patent on uncooled TEC-less vanadium oxide microbolometers themselves. FLIR only had patents and trade secrets related to certain elements involved in the manufacture of these devices. Latham explained, for example, that "FLIR and Indigo have proprietary designs, stabilization and modeling techniques for ROICs [this may refer to "readout integrated circuits], which allow the uncooled sensor to operate over a wide range of temperature without a TEC." This would not preclude another manufacturer from making a useful ROIC without FLIR's designs or techniques.

6

Latham therefore believed that, absent reliance on FLIR's intellectual property, it would take Former Employees at least three years to bring a viable TEC-less vanadium oxide microbolometer to market.

We emphasize here the complete change in theory on FLIR's cause of action for misappropriation of trade secrets. As pleaded in the complaint in the underlying action, FLIR had alleged that Former Employees' business plan *itself* was FLIR's trade secret, as it allegedly had been developed by Former Employees when at FLIR for FLIR's benefit – and that Former Employees' assertions that the plan had been independently developed by Fitzgibbons prior to joining Indigo were unworthy of belief.[6] But Latham had been given documentation showing that the business plan had, in fact, been developed prior to Fitzgibbons joining Indigo, and had further been told that Former Employees were negotiating to license technology for their new venture from Raytheon. Latham now pursued the theory that *if* Former Employees' new business venture involved the mass production of TEC-less vanadium oxide microbolometers *to go to market within three years*, Former Employees *must be planning* to use FLIR's intellectual property, because Latham was informed that such production could not be achieved in that time frame[7] without the use of FLIR's intellectual property.[8]

---

[6]     Indeed, the complaint alleged that Former Employees' assurances that they would not use FLIR's intellectual property in their new venture were "belied" by Fitzgibbons's assertion that the business plan had been developed before he had joined Indigo. In other words, the complaint alleged that this purported misrepresentation was a reason to disbelieve Former Employees in general.

[7]     In time, this number would decrease. By the time of trial, Latham argued that the production could not be accomplished within *one year* without FLIR's technology.

7

4.      *The Motion for Summary Judgment in the Underlying Action*

In December 2006, Former Employees moved for summary judgment in the underlying action. FLIR's opposition to the motion argued that "there is irrefutable evidence that [Former Employees] planned to launch [their new] business using [FLIR]'s proprietary designs and manufacturing processes for infrared components, and that they could only achieve their stated goals using [FLIR]'s intellectual property . . . ."[9] This evidence consisted, largely, of two brief expert declarations. The first, from Dr. Dean Neikirk, stated that, based on his experience and background, he is "not aware of any third party in the infrared market, other than Plaintiff FLIR, that has the requisite technology and capability to produce a high volume of bolometers at yields and costs sufficient to support" Former Employees' business plan. He stated that he knows of no "public domain literature demonstrating that any third party has the ability [to] produce a high volume of TEC-less [vanadium oxide] bolometers at a low cost."

---

[8]      We pause here to question whether anyone – expert or not – could actually venture an opinion on whether such microbolometers could be manufactured within three years without the use of FLIR's intellectual property. That is to say, an expert could know the state of the technology in the public domain, and could also know the products other manufacturers have on the market; but no expert could know what all other manufacturers have in development. Putting it another way, Latham was informed that the production could not be achieved within three years without FLIR's technology, but Latham had no way of knowing whether someone else had, in fact, been working on that very problem for the last two years and eleven months, and was prepared to go to market imminently.

[9]      In the instant action, Former Employees submitted to the trial court, in opposition to Latham's anti-SLAPP motion, a computer disk containing the entirety of the appellate record of the appeal in the underlying action. We take judicial notice of that record.

He therefore concluded that Former Employees "could not pursue" their business plan without the use of FLIR's trade secrets. The second expert, Daniel Murphy submitted a similar declaration.[10] At trial, both experts explained that their opinions were based only on public domain information regarding technology held by third parties; they did not consider private technology third parties may possess. While this limitation might not render the experts' declarations affirmatively false, it utterly undermined their value in establishing the point for which Latham offered them. Latham had argued that the expert declarations established that no party other than FLIR had the necessary technology to meet the specifications of Former Employees' business plan; yet the expert declarations omitted all non-public domain technology from their consideration.

The trial court denied Former Employees' motion for summary judgment.[11] First, the court concluded that Former Employees failed to sustain their burden of proof. The court explained, "[Former Employees] have made a compelling argument that they

---

[10] Dr. Neikirk, who had never worked at Raytheon, included two paragraphs in his declaration reaching the conclusion that Former Employees' presently stated goals of their planned venture with Raytheon were inconsistent with the goals of Former Employees' business plan. In contrast, Murphy, who had worked at Raytheon, stated nothing about Raytheon in his declaration. At trial, Murphy testified that he had executed a nondisclosure agreement with Raytheon which prevented him from using or disclosing nonpublic Raytheon technology. He therefore *excluded Raytheon's nonpublic technology* from his opinions in the case, although this was not mentioned in his declaration. In other words, Murphy's declaration states that there is no *public domain* information demonstrating that a third party possessed the necessary technology, while *declining to mention* that he was excluding his knowledge of *non-public domain* technology owned by *the precise entity from whom Former Employees intended to license their technology*.

[11] Latham would subsequently argue, in the instant matter, that this summary judgment denial established that it brought the underlying action with probable cause.

9

are entitled to judgment at this stage. Nonetheless, the concepts involved in this action are highly technical. Following a review of the [1999, 2004, and recent versions of the business plan], the court is unable to find as a matter of law, for purposes of this motion only, that [FLIR] own[s] none of the concepts for [Former Employees'] new business, that nothing in the . . . business plan made use of [FLIR]'s proprietary confidential information, intellectual property, or work product, or that all concepts in the [business] plan were identical to those in the 1999 plan." The court further stated, "Even if defendants had sustained their burden of proof on the motion, plaintiffs have produced sufficient evidence, for example with the Neikirk and Murphy declarations, to raise a triable issue as to misappropriation of trade secrets."

5.     *The Former Employees' Victory at Trial*

The case proceeded to a bench trial, before the same judge who had denied the summary judgment motion. At the time of trial, Former Employees requested a finding that the action was brought and pursued in bad faith, and an award of reasonable attorney fees, under the Uniform Trade Secrets Act (UTSA). After trial, the court issued a lengthy statement of decision, denying FLIR relief and awarding Former Employees their attorney fees.

The court denied relief to FLIR on the basis that FLIR's complaint "rested on concern and speculation that Defendants would, in the future, misappropriate trade secrets if [Former Employees] started a new, competitive company." The court explained, "California law prohibits injunctions based on a former employer's concern

10

and speculation that a departing employee might commit future trade secret misuse. The 'inevitable disclosure' theory is not followed by California Courts."[12] While the court conceded that Former Employees' conduct had "raised a reasonable suspicion that they might misuse [FLIR's] trade secrets," the court concluded that a reasonable suspicion is not a basis for relief. FLIR could only prevail if it established actual misappropriation or a threat of imminent misuse of its trade secrets. The argument that Former Employees might misappropriate trade secrets in the future did not support relief; it would only support an argument under the rejected " 'inevitable disclosure' " theory.

As to Former Employees' request for attorney fees, the court noted that its earlier denial of the summary judgment motion did not preclude it from finding bad faith. The court explained, "[Former Employees'] request for a finding of bad faith was not at issue on the motion for summary judgment. The Court had not heard all the evidence or considered witness credibility. The denial of the motion was not a ruling on whether [FLIR] initiated or maintained the lawsuit in bad faith." Turning to the merits of the attorney fee request, the court concluded that bad faith is only established by objective and subjective bad faith. Objective bad faith is "examined by whether the facts indicate

---

[12]     "The doctrine of inevitable disclosure permits a trade secret owner to prevent a former employee from working for a competitor despite the owner's failure to prove the employee has taken or threatens to use trade secrets. Under that doctrine, the employee may be enjoined by demonstrating the employee's new job duties will inevitably cause the employee to rely upon knowledge of the former employer's trade secrets." (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1446.) "This doctrine is contrary to California law and policy because it creates an after-the-fact covenant not to compete restricting employee mobility." (*Id.* at p. 1447.)

that the accusation was specious under the elements of the UTSA claim." Subjective bad faith is "examined by whether the circumstances indicate that the plaintiff knew or was reckless in not knowing that the claim lacked merit." Considering these factors, the court concluded that FLIR "initiated and continued to pursue this action against [Former Employees] in bad faith and primarily for the anticompetitive motive of preventing [Former Employees] from attempting to create a new business in competition with [FLIR]." It concluded that FLIR had been "unwilling to take the risk that [Former Employees] might be able successfully to compete without misuse of [FLIR's] trade secrets."

The court specifically found that FLIR's suspicions regarding Former Employees "were not sufficient to justify the filing of this lawsuit on June 15, 2006, or the maintenance of the lawsuit through trial in December 2007." The court stated that the case was initiated and pursued in bad faith in that the legal theory supporting the case was inevitable disclosure, which is not supported by California law. The court also identified several specific facts which supported its conclusion of bad faith, including that FLIR "stated that [it] had suffered damages without supporting evidence, and did not withdraw the claim for actual damages until the spring of 2007." Additionally, the court stated that FLIR "did not have a sufficient basis to initiate and maintain the lawsuit and failed to take reasonable measures to allay [its] fears by learning more about [Former Employees'] plans. Three of [FLIR's] witnesses testified that they did not know at the time of the June 2006 filing of the lawsuit that [Former Employees] planned

12

to work with Raytheon, on a non-commercial military business model, and that, had they known such facts, their concerns regarding [Former Employees] would have been allayed."  Former Employees were awarded over $1.6 million in attorney fees.

6.    *The Judgment and Attorney Fee Award are Affirmed*

FLIR appealed the judgment and the attorney fee award.  The Court of Appeal affirmed.  (*FLIR Systems, Inc. v. Parrish, supra,* 174 Cal.App.4th at p. 1274.)  In affirming the attorney fee award, the court stated, "As we shall explain, [FLIR] does not appear to appreciate the trial court's factfinding power and its discretionary power to award attorney fees and costs to curtail a bad faith claim of trade secret misappropriation." (*Id*. at p. 1276.)  The court specifically rejected FLIR's claim that the denial of Former Employees' motion for summary judgment estopped the court from finding bad faith.  (*Id*. at p. 1282.)  The Court of Appeal noted that the trial testimony of FLIR's experts undermined their declarations, and concluded that the trial court had denied summary judgment "because it had not heard all the evidence or considered witness credibility." (*Id*. at p. 1283.)  Ultimately, the Court of Appeal concluded that "[t]he trial court reasonably inferred that [FLIR] knew there was no misappropriation or threatened misappropriation of trade secrets before the summary judgment motion was argued." (*Id*. at p. 1283.)

7.    *The Instant Action*

On April 6, 2012, Former Employees filed the instant malicious prosecution action against Latham.[13]  They alleged that Latham brought and pursued the underlying action with malice and without probable cause.  They specifically alleged that the action was pursued on the theory that Former Employees would misuse trade secrets in the future, even though the legal basis for that theory (inevitable disclosure) was discredited.  Instead, Former Employees alleged, Latham brought the action knowing that FLIR had an anti-competitive purpose in bringing it.

8.    *Latham's Anti-SLAPP Motion*

On May 14, 2012, Latham filed its anti-SLAPP motion.  Latham argued, and Former Employees do not dispute, that the malicious prosecution action arises out of Latham's protected petitioning activity and is therefore the proper subject of an anti-SLAPP motion.  The issue in this case is whether Former Employees can establish, as required by the statute, that they have a probability of prevailing on their complaint.  (Code Civ. Proc., § 425.16, subd. (b)(1).)

To prevail on a malicious prosecution cause of action, the plaintiff must establish favorable termination on the merits, lack of probable cause, and malice.  (*Roger Cleveland Golf Co., Inc. v. Krane & Smith, APC* (2014) 225 Cal.App.4th 660, 684 (*Roger Cleveland Golf*).)  Latham argued that Former Employees would be unable to establish a probability of prevailing on their action for two reasons:  (1) the action is

---

[13]    There had been a tolling agreement, accounting for part of the delay in filing suit.

14

untimely under Code of Civil Procedure section 340.6;[14] and (2) the trial court's denial of summary judgment in the underlying action establishes that Latham brought the underlying action with probable cause as a matter of law.[15]

Former Employees opposed the motion. First, they argued that Code of Civil Procedure section 340.6 is not the appropriate statute of limitations and that, under the appropriate statute, Code of Civil Procedure section 335.1,[16] the action was indisputably timely. Second, Former Employees argued that they could establish that the underlying action was brought by Latham without probable cause. Specifically, they argued that there were several reasons why the trial court's denial of summary judgment did not mandate a finding of probable cause, including that the trial court's later finding of bad faith undermined the value of the denial of summary judgment in this context. Former Employees also argued that, consideration of the evidence independently (regardless of any trial court rulings) gives rise to an inference of lack of probable cause.

The trial court granted Latham's anti-SLAPP motion, on the basis of the statute of limitations. The trial court expressly did not address the arguments relating to probable cause and the effect of the trial court's rulings. Former employees filed a timely notice of appeal. Latham was awarded its attorney fees and costs, as prevailing

---

[14]    Code of Civil Procedure section 340.6, subdivision (a), provides a one-year statute of limitations for "[a]n action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services . . . . "

[15]    Latham's anti-SLAPP motion did not challenge the issue of malice.

[16]    Code of Civil Procedure section 335.1 provides a two-year statute of limitations for an action for injury "caused by the wrongful act or neglect of another."

15

party on the anti-SLAPP motion.  Former employees filed a second notice of appeal, from this order.

## *ISSUES ON APPEAL*

The initial issue on appeal is whether the trial court erred in concluding the action was untimely under Code of Civil Procedure section 340.6.  While this appeal was pending, we resolved *Roger Cleveland Golf, supra,* 225 Cal.App.4th at p. 668, in which we concluded that "the applicable statute of limitations for malicious prosecution is [Code of Civil Procedure] section 335.1, irrespective of whether the party being sued for malicious prosecution is the former adversary . . . or the adversary's attorneys . . . . " As Latham concedes the action is timely under Code of Civil Procedure section 335.1, and we have no intention of reversing the position taken in *Roger Cleveland Golf*, the trial court's rationale for granting the anti-SLAPP motion no longer applies.

The parties thus turned their attention to the alternative basis on which Latham pursued its motion, whether Former Employees have established a probability of prevailing, particularly with respect to the element of lack of probable cause.  Latham argues that the trial court's denial of summary judgment in the underlying action establishes probable cause under the so-called interim adverse judgment rule.  Former Employees argue that the interim adverse judgment rule does not apply given the trial court's subsequent rulings, and also that the evidence independently establishes a probability of prevailing on the element of lack of probable cause.  We agree with Former Employees and therefore reverse.

16

## DISCUSSION

1.    *Standard of Review*

"[T]he issue on appeal is whether [the malicious prosecution plaintiff] presented evidence in opposition to [the malicious prosecution] defendants' anti-SLAPP motions that, if believed by the trier of fact, would be sufficient to support a judgment in his favor.  This question is one of law, and we review the trial court's decision de novo.  [Citations.]  In doing so, we 'consider[] the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though [we do] not *weigh* the credibility or comparative probative strength of competing evidence, [we will] grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'  [Citation.]"  (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047-1048.)

2.    *The Statute of Limitations Does Not Bar This Action*

Latham prevailed on its anti-SLAPP motion on the theory that Former Employees could not establish a probability of prevailing on the basis that this action was barred by the one-year statute of limitations of Code of Civil Procedure section 340.6.  While there is some authority supporting the conclusion that Code of Civil Procedure section 340.6 applies to malicious prosecution actions against attorneys, we disagreed with that authority in *Roger Cleveland Golf, supra,* 214 Cal.App.4th at p. 668.  Considering the statutory language, the legislative history, the applicable public policy, and the interests of interpreting a statute to avoid absurd results, we concluded

17

that Code of Civil Procedure section 340.6 does not apply to malicious prosecution actions. (*Id*. at p. 677.) Latham agrees that Former Employees' malicious prosecution action is timely when considered with respect to the two-year statute of Code of Civil Procedure section 335.1. We therefore turn to the alternative basis on which Latham argued Former Employees could not establish a probability of prevailing: the lack of probable cause element of malicious prosecution.

### 3. *Probable Cause*

"To establish a cause of action for malicious prosecution, a plaintiff must plead and prove that the underlying action was (1) commenced by or at the direction of the defendant and pursued to a legal termination in the plaintiff's favor; (2) brought without probable cause; and (3) initiated with malice. [Citations.] Probable cause is a legal question to be resolved by the court; malice is a factual question to be resolved by a jury. [Citations.] [¶] Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. '[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal [citation], i.e., probable cause exists if "any reasonable attorney would have thought the claim tenable." [Citation.] This rather lenient standard for bringing a civil action reflects "the important public policy of avoiding the chilling of novel or debatable legal claims." [Citation.] Attorneys and litigants . . . " 'have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . . ' " [Citation.]' " (*Plumley v. Mockett, supra,*

164 Cal.App.4th at p. 1047.) "Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause— are the least meritorious of all meritless suits. Only this subgroup of meritless suits present no probable cause." (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 382.)

### 4. *The Interim Adverse Judgment Rule Does Not Apply*

A rule has developed, known as the interim adverse judgment rule, that a victory in an underlying action at trial – even if subsequently reversed on appeal – establishes that probable cause existed to bring that action. "[D]ecisions in California and elsewhere established that a trial court judgment or verdict in favor of the plaintiff or prosecutor in the underlying case, unless obtained by means of fraud or perjury, establishes probable cause to bring the underlying action, even though the judgment or verdict is overturned on appeal or by later ruling of the trial court. . . . Because malicious prosecution suits have the potential to penalize and deter the legitimate invocation of the judicial process for redress of grievances, only claims that a reasonable litigant or attorney would have seen as lacking all merit should form the basis for such a suit. Claims that have succeeded at a hearing on the merits, even if that result is subsequently reversed by the trial or appellate court, are not so lacking in potential merit that a reasonable attorney or litigant would necessarily have recognized

their frivolousness." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817-818, footnote omitted, abrogated by statute on another ground, as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 547.)

For similar reasons, the interim adverse judgment rule applies when there has been a denial of a defendant's motion for summary judgment in the underlying action. "[S]uccess at trial shows that the suit was not among the least meritorious of meritless suits, those which are totally meritless and thus lack probable cause. [¶] Denial of a defendant's summary judgment motion provides similarly persuasive evidence that a suit does not totally lack merit." (*Roberts v. Sentry Life Insurance, supra,* 76 Cal.App.4th at p. 383.) A trial court's conclusions on summary judgment, that genuine issues of material fact exist, "necessarily imply that the judge finds at least some merit in the claim. The claimant may win, if certain material facts are decided favorably. This finding (unless disregarded) compels [the] conclusion that there is probable cause, because probable cause is lacking only in the *total absence* of merit." (*Ibid.*)

Certain exceptions apply to the operation of the interim adverse judgment rule. If the interim ruling was obtained by fraud or perjury, the ruling does not establish that probable cause existed. (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 820.) If the summary judgment motion was denied "on procedural or technical grounds, rather than for existence of triable issues of material fact," the summary judgment denial does not establish that probable cause existed. This is so because the

20

denial on procedural grounds "says nothing regarding the potential merit of the action." (*Id*. at p. 823.)

The instant case presents the issue of a third possible exception: whether the interim adverse judgment rule applies when there has been a subsequent ruling in the underlying action that the underlying action was, in fact, brought in bad faith. The interim adverse judgment rule infers from the fact that the trial court in the underlying action denied summary judgment that the trial court found at least *some merit* to the claim. But the trial court *also* found, in connection with its award of sanctions, that the action was objectively specious – supported by a complete lack of facts and seeking relief on a discredited legal theory. The latter findings cannot coexist with the former; if there was a complete lack of facts and law supporting the underlying action at the time of summary judgment, the summary judgment motion should have been granted.[17] The question therefore arises if the interim adverse judgment rule applies when subsequent rulings in the underlying action expressly undermine the probable cause inference which would otherwise arise from the interim summary judgment denial.[18]

---

[17] The trial court and Court of Appeal in the underlying action both suggested a variety of reasons to explain why the summary judgment motion was denied (despite their subsequent determination that, in hindsight, the case was wholly without merit at that time) – these included that: (1) the case was highly technical and the trial court denied summary judgment in an abundance of caution; (2) all of the evidence was not before the trial court at summary judgment, nor were issues of credibility considered; and (3) the denial of summary judgment relied on the expert declarations, which, at trial, were revealed to have been based on unreasonable assumptions.

[18] Former employees do not argue that the trial court's findings that the underlying action was brought in objective and subjective bad faith are entitled to collateral estoppel effect in the instant action; we therefore do not reach the issue. It appears to be

This issue was presented, and resolved, by Division Four of the Second Appellate District in *Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306 (*Slaney*). In that case, an insurance company denied a claim by its insureds for damage to a plane. On behalf of the insureds, the plane's prior owner prepared an estimate for repair to the plane. The insurer denied the claim and asserted that the insured and the prior owner had conspired to present a fraudulently excessive claim. When the insureds sued their insurer for bad faith, the insurer cross-complained against the insureds and the prior owner for fraud. The prior owner moved for summary judgment; the motion was *denied*. However, the prior owner subsequently renewed the motion (before a second judge), based on additional evidence, and the motion was granted. Thereafter, in the litigation between the insurer and the insureds, the insureds prevailed in their claim for bad faith, and the jury concluded that the insurer's denial of the claim – based on its assertion of fraud against the insureds and the prior owner – was malicious. Punitive damages were awarded. (*Slaney, supra,* 115 Cal.App.4th at p. 309.) The prior owner brought a malicious prosecution action against the insurer. The insurer filed an anti-SLAPP motion, arguing that the initial denial of the prior owner's motion for summary judgment established that the insurer had probable cause to pursue its action

---

undecided. (See *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 332 [party failed to preserve the issue of whether findings in connection with attorney fee award in a Lanham Act case had collateral estoppel effect in a subsequent malicious prosecution action]; but see *Wright v. Ripley* (1998) 65 Cal.App.4th 1189, 1191-1195 [declining to give collateral estoppel effect to a ruling on a summarily-resolved sanctions motion under Code of Civil Procedure section 128.5].)

22

against the prior owner under the interim adverse judgment rule. The trial court denied the anti-SLAPP motion and the Court of Appeal affirmed. (*Id*. at p. 309.)

On appeal, the court concluded that the interim adverse judgment rule did not apply under the circumstances of the case. (*Slaney, supra*, 115 Cal.App.4th at pp. 309-310.) The court recognized that the denial of summary judgment is generally sufficient to establish probable cause, and the prior owner's subsequent success on the renewed summary judgment motion was not enough to undermine this conclusion. (*Id*. at p. 320.) However, the fact that the jury ultimately found that the denial of the claim was done with malice, and awarded punitive damages, was sufficient to undermine the effect of the prior summary judgment denial. The jury concluded that the insurer's theory of conspiracy between its insureds and the prior owner was fraudulent and prosecuted in bad faith. Given this finding, the first denial of summary judgment was offset.[19] (*Id*. at p. 321.)

---

[19] Latham offers a different interpretation of the *Slaney* opinion, arguing that the *Slaney* court had simply concluded that it was not clear on what basis the first judge had denied summary judgment, so the summary judgment denial did not establish probable cause. Latham argues that *Slaney*'s conclusion was simply that "an inexplicable ruling cannot establish probable cause" and utterly disregards the *Slaney* court's reliance on the jury's finding of malice. Indeed, Latham argues that "[t]he *Slaney* court held that, in this unusual fact pattern, 'the ultimate grant of summary judgment in favor of the [malicious prosecution plaintiff] is sufficient to offset the first denial of the motion for summary judgment' and to defeat the interim adverse judgment rule." We wholly disagree with this interpretation. Indeed, Latham quotes only a portion of the conclusion from the *Slaney* opinion. The court actually stated, "Given the further finding of malice, and the award of punitive damages by the jury, it is reasonable to infer that the jury concluded [the insurer]'s theory of conspiracy to defraud between [the prior owner] and the [insureds] was itself fraudulent and prosecuted in bad faith. This, along with the ultimate grant of summary judgment in favor of [the prior owner] is sufficient to offset the first denial of the motion for summary judgment." (*Slaney,*

23

We conclude *Slaney* controls the result in the instant case. In the absence of an exception to the rule, the interim adverse judgment rule would apply and render the denial of summary judgment in the underlying action conclusive evidence that the underlying action was brought with probable cause. However, in the very same action, the trial court *also* concluded that the underlying action was brought in objective and subjective bad faith, with no legal or factual basis. This finding offsets the denial of summary judgment, and defeats the application of the interim adverse judgment rule in this case.[20] (See also *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1026 [applying the interim adverse judgment rule and noting that there was nothing in the record indicating that the trial court in the underlying case sanctioned the malicious prosecution defendants or even suggested that they were less than forthright in their presentation of the case].)

---

*supra,* 115 Cal.App.4th at p. 321.) It was not the ultimate grant of summary judgment that was dispositive (*id.* at p. 320), but the finding of malice and bad faith (*id*. at p. 321).

[20]    As we shall next discuss, there is some dispute as to whether the findings in the underlying action have *evidentiary value* in the instant case. There is no dispute, however, that we may take judicial notice of the fact that the prior court made certain findings, without regard to whether they were true. (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 885.) In other words, we may take judicial notice of the fact that the trial court found bad faith; it is unclear whether the trial court's finding of bad faith may constitute evidence of lack of probable cause. But it is the *fact* of the finding of bad faith alone that defeats the application of the interim adverse judgment rule in this case. The interim adverse judgment rule takes its value from the fact that the underlying trial court denied summary judgment (and applies regardless of whether that ruling was correct); similarly, the exception to the rule takes its value from the fact that the underlying trial court subsequently found bad faith (and applies regardless of whether that finding was correct).

5.      *There is Evidence of Lack of Probable Cause*

Because the interim adverse judgment rule does not apply, we simply consider whether Former Employees have demonstrated a probability of prevailing on the issue of lack of probable cause.[21]

There is some authority that concludes that a trial court's finding of malice or baselessness in an underlying action is itself evidence of a lack of probable cause. (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP, supra,* 184 Cal.App.4th at pp. 332-333; *Slaney, supra,* 115 Cal.App.4th at p. 321; *Mattel Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1191; but see *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP, supra,* 184 Cal.App.4th at pp. 368-371 (dis. opn. of Mosk, J.).)

Even if the trial court's findings of bad faith in the underlying action do not constitute evidence of a lack of probable cause, Former Employees have offered sufficient evidence of a probability of prevailing on this element of their malicious prosecution cause of action.  Former Employees have evidence of the following: (1) Latham filed a complaint alleging a cause of action for actual misappropriation of trade secrets based solely on allegations that Former Employees misappropriated a business plan which they had created for FLIR, and disregarding Former Employees'

---

[21]      As in *Slaney,* the only evidence Latham submitted on the issue of probable cause was that Former Employees' motion for summary judgment had been denied.  Latham "offered no evidence that [anyone at the firm] had undertaken an investigation to determine reasonable cause to believe the allegations . . . had any basis in truth." (*Slaney, supra,* 115 Cal.App.4th at p. 319.)

25

claim that they had created the business plan previously;[22] (2) when Former Employees presented documentation establishing the business plan was not FLIR's intellectual property (as it had been created prior to Former Employees' employment at Indigo), Latham completely changed the theory of the misappropriation cause of action to pursue an argument that Former Employees *could not* effectuate the business plan in the time frames set forth therein without using FLIR's intellectual property;[23] (3) Latham knew or should have known that inevitable disclosure is not a viable legal theory in California, and that its theory therefore lacked a legal basis; (4) the factual basis for Latham's theory was expert testimony which considered only publicly available technology, when Latham knew that Former Employees intended to license non-public technology from Raytheon; and (5) FLIR's President gave testimony indicating that he had no factual basis for the assertion that Former Employees would use FLIR's intellectual property, and strongly implying that this action was nothing more than

---

[22]    Indeed, Former Employees submitted deposition testimony from Latham indicating that, at the time of the complaint, the only evidence of actual misappropriation known to Latham was that the business plan Former Employees were then circulating was similar to the plan Former Employees had presented to FLIR.

[23]    We again stress the speculative nature of this argument. In order for the theory to prevail, one must assume that: (1) no one other than FLIR possessed non-public technology that could meet the time frames in the business plan; (2) no one other than FLIR could innovate in the industry and create the necessary technology to meet the time frames in the business plan; (3) Former Employees would, in fact, pursue the business as set forth in the business plan; (4) Former Employees would keep to the time frames in the business plan; and (5) Former Employees would misappropriate FLIR's trade secrets rather than allow a delay in production, if it came to pass that they did not legally possess the appropriate technology.

26

a preemptive strike.**24** This evidence, taken together, supports the conclusion that Latham pursued an obviously meritless claim against Former Employees.

Moreover, the record of the underlying action indicates that Latham, on behalf of FLIR, sought, among other remedies, an injunction prohibiting Former Employees from "[s]elling uncooled TEC-less [v]anadium [o]xide microbolometers in commercial markets less than twelve months after the date on which [Former Employees] or either of them, enter into a license with Raytheon or any other third party to purchase intellectual property . . . . " In other words, Latham pursued a theory of the case that since it was, allegedly, so certain that Former Employees and Raytheon could not bring a TEC-less vanadium oxide microbolometer to market within one year without using FLIR's technology, FLIR was entitled to an injunction preventing Former Employees from even *attempting to do so*. The UTSA allows an injunction for "[a]ctual or threatened misappropriation" of a trade secret. That Latham sought an obviously anti-competitive injunction based on the speculative possibility that the Former Employees' product *might* violate its client's trade secret rights further supports the conclusion that no reasonable attorney would have believed this case had merit. Former Employees

---

**24** At his videotaped deposition, FLIR's President Earl Lewis was asked how he knew that Former Employees would use any trade secrets in their planned new business. He replied "I wouldn't know for sure." The following questions and answers then occurred: "Q How would you go about finding out for sure?" "A You could wait for them to spend all of their money, go into production against us and then enter into a lawsuit. Or you could try to figure out how to deal with it in advance before they did that." "Q Did FLIR select either of those options?" "A Yes." "Q Which option did it select?" "A We decided to pursue it in advance of them going into production."

have demonstrated a reasonable probability of prevailing on the element of lack of probable cause.

Latham's anti-SLAPP motion should have been denied. As such, the order granting Latham its attorney fees and costs as prevailing party must also be reversed.

### DISPOSITION

The order granting Latham's anti-SLAPP motion and the order granting Latham its attorney fees and costs as prevailing party are reversed. Former Employees shall recover their costs on appeal.

***CERTIFIED FOR PUBLICATION***

KLEIN, P. J.

I CONCUR:

KITCHING, J.