Siggins, J.
*776 *101 This case arises out of a failed real estate purchase by appellant Joseph Tierney from respondents, husband and wife, Nasir Javaid and Dejauna Joseph, the owners of the real property at 376 Castro Street in San Francisco (Property). Tierney contracted with Nasir and Dejauna in 2004 to purchase the Property, where the couple ran a gas station, so he could build a condominium project. As a condition of closing the deal, however, he had to first obtain the necessary "Entitlements" for development from the City and County of San Francisco (City).
The entitlement process was complicated and involved. It ended up taking Tierney eight years-until 2012-to secure the conditional use permit authorizing him to demolish the gas station and construct the residential units. At that point, however, Nasir refused to sell, asserting their deal had expired and Tierney had failed to perform on time.
In 2014, Tierney and 376 Castro Street, LLC (collectively Tierney) sued Nasir, Dejauna, and their business Naz Auto Services (collectively the Naz Parties). Two causes of action were tried to the jury-breach of contract (specific performance) to compel sale of the Property and quantum meruit for Tierney to recover costs for work performed at a separate gas station Nasir owned in Mountain View.
On the breach of contact claim, the trial court found the jury hopelessly deadlocked and declared a mistrial. At Tierney's request, the court decided that claim in a statement of decision. It found Tierney failed to perform his contractual obligations and was not entitled to specific performance. But the jury reached a verdict in Tierney's favor on the quantum meruit claim, *102 awarding him $156,000 as the reasonable cost of work he did at Nasir's Mountain View gas station. The court vacated this verdict because Tierney had not produced a certificate of licensure to show his compliance with Business and Professions Code section 7031. The trial court thus entered judgment in favor of the Naz Parties and awarded them attorneys' fees, costs, and other expenses.
We affirm in part and reverse in part. In the published portion of this opinion, we conclude Tierney's election to have the trial court decide his specific performance claim waived any claims of error he had based on the jury trial proceedings leading up to and including the mistrial declaration. We also conclude there was substantial evidence to support the trial court's finding that Tierney failed to perform his part of the contract by not timely paying the purchase price after securing the Entitlements, and thus, he was properly denied specific performance. However, we reverse the trial court's order granting judgment notwithstanding the verdict on Tierney's quantum meruit claim. We also conclude the court erred in awarding the Naz Parties $96,233.12 to in non-statutory costs. In all other respects, we affirm the attorneys' fees and costs award.
FACTUAL AND PROCEDURAL BACKGROUND
The Parties and the Property
In 2004, Nasir and Dejauna bought the Property and gas station for $2.75 million.
*777 The following year, Tierney, a general contractor and real estate developer who wanted to build condominiums on the site, offered to purchase the Property.
The Purchase and Sale Agreement
The parties executed a non-binding letter of intent summarizing the terms and conditions for Tierney's purchase. Their deal was memorialized in a purchase and sale agreement dated August 20, 2004 ("PSA").
The PSA required the purchase price of $3,434,000 be paid to Nasir and Dejauna in two stages. In the "First Closing," Tierney had to pay 10% of the price, or $340,000, by August 23, 2004, for a 10% ownership of the Property as a tenant in common. In the "Second Closing," Tierney had to pay the $3,094,000 balance of the purchase price, to obtain 100% ownership.
Section 5(a) of the PSA set forth two conditions precedent to the second closing. First, Nasir and Dejauna had to satisfy the "ARCO Condition,"
*103 which required them to secure a quitclaim deed from the Atlantic Richfield Company (ARCO), the gas station's historic supplier, to release any interest ARCO potentially had in the Property. Second, Tierney had to obtain "all permits, approvals and other entitlements required by the [City] with respect to the construction and development of at least [22] residential units," which the PSA defined as the "Entitlements." The Entitlements did not include "ministerial building permits."
If either condition was unfulfilled by August 31, 2005-defined in the PSA as "the Entitlement Deadline"-Tierney could reclaim his initial $340,000 payment (minus $50,000) upon relinquishing his 10% interest in the Property. Alternatively, Tierney could "retain [his] 10% tenancy in common interest in the Property without proceeding to the Second Closing," and Nasir and Dejauna would keep the initial $340,000 payment.
Section 5(b) of the PSA obligated Tierney to "proceed in good faith to attempt to obtain the Entitlements" but did not obligate him "to pay extraordinary application fees or accept any particular restriction on the proposed project." This subsection also made Tierney responsible for clearing the ARCO Condition to the extent Nasir and Dejauna wanted him to help.
If the second closing conditions were fulfilled, Section 8(d)[1] of the PSA required Tierney to pay off the balance of the purchase price-$3,094,000-"on or before the date (30) days after both (i) [Tierney] obtained the Entitlements, and (ii) the ARCO condition has been satisfied. ... Time is of the essence of this deadline." The second closing was "expressly subject to the satisfaction of the conditions set forth in Section 5."
The PSA reflected "the entire agreement between the parties" and could not "be modified in any manner except by an instrument in writing executed by the parties."
The Process to Secure Entitlements
Tierney paid Nasir and Dejauna $340,000 in August 2004 and satisfied the first closing. To secure the Entitlements, Tierney assembled a development team, which included a "permit expediter" to work as a liaison with the City to move the project through the entitlement process, a project designer, and a land use attorney. Tierney's land use attorney described the *778 process for securing a conditional use permit (CUP) from the City as "extraordinarily difficult." The length of a given project's entitlement process varies and *104 cannot be predicted; the process can go anywhere from two years to 10 years. A significant portion of the time is taken up by the City's Planning Department's (Planning) review processes.
The project's entitlement phase began in September 2004 when Tierney submitted an environmental review application to Planning. In August 2005, the project was assigned an environmental planner. In November 2005, Tierney filed the conditional use application for demolition of the gas station and construction of residential units on the Property.
During the entitlement process, the project encountered several difficulties, including two separate lawsuits. In November 2005, Nasir and Dejauna filed a partition action against Tierney alleging Tierney breached the PSA because he had failed to obtain the Entitlements by August 31, 2005. Since Tierney was a 10% owner of the Property, Nasir and Dejauna asked the court to force a sale of the Property and split the proceeds. In December 2005, BP West Coast Products LLC (BP), ARCO's successor-in-interest, sued the Naz Parties and Tierney, seeking to rescind the PSA on the ground that the agreement had violated BP's right of first refusal. In June 2006, both lawsuits were resolved when the parties entered into a "Settlement Agreement, Release and Conditional Covenant Not to Sue" (Settlement Agreement). Nasir and Dejauna agreed to dismiss their partition action without prejudice. Tierney agreed to pay $150,000, to resolve the BP lawsuit and satisfy the ARCO Condition in the PSA.
In September 2006, the project faced another hurdle when Planning incorporated Tierney's project into a "charrette" process instituted by City Supervisor Bevan Dufty, who wanted all new projects in his district to be considered holistically. The charrette was a planning study for Supervisor Dufty's district so that the community's vision could be integrated into the area's development. The charrette took most of 2007 and extended into 2008. It involved multiple community workshops and culminated with the publication of the "Upper Market Development Design Guidelines" in October 2008. The design guidelines, which set forth the community's vision for the area, provided new and additional standards against which Planning would review any proposed project in the area.
In addition, during the charrette, Supervisor Dufty directed Tierney's development team to look for a "community-based organization" as a tenant in response to community requests for "some sort of public benefit use" in buildings. The supervisor provided the team a list of contacts of community organizations for potential building occupants, including the San Francisco AIDS Foundation. By February 2009, Tierney had hired a commercial real estate broker to deal with the Foundation and see if they could occupy the proposed building. Ultimately, no deal was ever reached with the Foundation.
*105 In 2009, Tierney refocused his efforts on the residential plan. In the years that followed, the team worked on implementing the design guidelines from the charrette process, addressing Planning's comments related to the design and conducting neighborhood outreach. In November 2011, Planning published the project's preliminary negative declaration. In July 2012, Planning approved the project's final mitigated negative declaration, which concluded its environmental analysis.
*779 Nasir's Mountain View Gas Station
In May 2012, Nasir and Tierney had further dealings over a shuttered gas station Nasir owned in Mountain View. Nasir needed money to refurbish the Mountain View station to make it fully operational, so he contacted Tierney about leasing the Castro Property. Tierney refused Nasir's request because he thought he would soon obtain the necessary permits and obtain the Entitlements for the project.
However, to address Nasir's need for cash, Tierney offered Nasir $75,000 to refurbish the Mountain View station provided it would be credited towards his purchase price owed on the Castro Property. On May 21, 2012, Nasir emailed Tierney stating that $75,000 was not enough to reopen the Mountain View station. Nasir further wrote that "[t]he original agreement we had is no longer valid since there is no closing date." He also proposed something new: "I can give you another year, but we would have to draft a new agreement with a closing date and if you are not able to close by that date, then you would have to agree to give up your 10% and lose your deposit .... I am offering this sale of the business to you for the last time .... Sorry, but I have to mitigate my damages and can not wait any longer for you to purchase my property."
To "keep the peace," Tierney went to the Mountain View station to assess what repairs were needed. During this time, Nasir showed Tierney a $30,000 estimate from RC Construction for the bathroom renovation. Tierney said that Nasir "showed [him] the amount of work to be done[,] gave me a set of plans and gave [him] some contracts he had with some people [and he] took it from there." Tierney testified that he remodeled the interior, worked with contractors, and managed the whole project.
In July 2012, during the course of Tierney's work in Mountain View, Tierney notified Nasir that he was paying one of the subcontractors and alerted Nasir that he needed to post a notice for an upcoming Planning hearing on the Property. Nasir responded, "Great, Thanks!!" Tierney testified that based on Nasir's response, he "would then be able to proceed and pay [Nasir] off for the rest of the money [he] owed him."
*106 Tierney worked close to a year on the station and emailed Nasir in April 2013 to inform him the work at the station was complete.
There was no written agreement for Tierney's work at the Mountain View station or for the exchanges agreed to by either party. At trial, Tierney testified that he believed whatever work he did on the Mountain View station would be credited to the balance he owed on the Castro Property. Nasir testified that their agreement was that Tierney was going to repair the bathroom for $25,000, and he was "going to have a subcontractor plumber and electrician. That was it." Nasir also testified that Tierney said he would do the work for free, which he found odd, but that he offered to pay. While Nasir stated he was clear to Tierney that the Mountain View work had nothing to do with the Castro Property, he also understood Tierney "just wanted to make sure that [he] was just still going to agree to have the 90 percent still on the market."
Nasir never paid Tierney for any of the work done at Mountain View but at trial said that he had "no problem compensating him ... whatever Tierney can prove and show" if he ever was provided an invoice of actual amounts worked. Around the time Tierney filed this lawsuit, he sent Nasir an invoice for approximately $237,475. Tierney said he spent approximately $90,000 on out-of-pocket costs for *780 contractors and equipment, and $99,000 in labor costs, which he later reduced to $83,000.
CUP Approved
On August 2, 2012, the Planning Commission (Planning Commission) held a CUP hearing for the project. The Planning Commission approved the CUP for the demolition of the gas station and the construction of a mixed-use building with 24-residential units. As a condition of approval, the Planning Commission directed Tierney to further work with Planning and neighborhood groups on the building design. The Planning Commission also required that the final approved plans for the building design be presented at a future meeting as "an informational item."
At the Planning Commission's June 6, 2013 meeting, the final building design was presented. At trial, Tierney's project designer stated that the purpose of this was to give more information to the Commission of items that had not yet been completed. Asked whether the project was approved at this hearing, he stated, "This was informational, so it was already approved, from my understanding."
Excluding his $340,000 first closing payment to Nasir and Dejauna and the $150,000 settlement payment to BP, Tierney testified he had spent $350,000 to entitle the Property at the point of securing the CUP.
*107 Property Advertised for Sale, Followed by this Lawsuit
Meanwhile, on June 6, 2013, Nasir received an appraisal of the Castro Property valuing it at $4.3 million. He then began to market the Property "so we could avoid this whole litigation," and set the price at $12 million. Tierney "couldn't believe" Nasir was advertising the Property for sale. Tierney's land use attorney testified that Tierney called him and said Nasir was "ignoring the contract and trying to sell the property to someone else, and [he] needed [Tierney's land use attorney] to do something about it."
On June 12, 2013, Tierney's land use attorney wrote Nasir and Dejauna a letter to alert them Tierney wished to close: "We hereby notify you that the Purchaser has received his entitlements for the 376 Castro Street project .... [T]he Purchaser hereby demands (1) that you close your business ... and (2) that the balance of your interest in the Property (90% ownership) be transferred to Purchaser." The letter directed Nasir and Dejauna to deposit a grant deed in escrow and further added, "We understand that you are attempting to market the Property to third parties. Please cease and desist from such efforts." Tierney's attorney notified Nasir and Dejauna that a lis pendens had been recorded against the property to stop any sale and that Tierney filed suit against them to compel completion of the sale under the PSA.
At the time, Tierney had not obtained any demolition or building permit for the project. Nor had he deposited the approximately $3 million balance of the purchase price into any escrow account for Nasir and Dejauna.
Trial Court Proceedings
Tierney's complaint alleged the Naz Parties had contractually agreed to sell him the Property, and that he had performed all conditions required of him. Tierney requested the Naz Parties be ordered to convey their 90% interest in the Property to him at the price set forth in the PSA less applicable credits. Tierney later amended his complaint to add a quantum meruit cause of action for the *781 work he performed on the Mountain View station.
Over the course of three weeks in March 2015, two causes of action for breach of contract and quantum meruit were tried before a jury. Immediately after the parties rested, the Naz Parties moved for a directed verdict on the quantum meruit claim for Tierney's purported failure to show compliance with state contractor's law licensure requirements under Business & Professions Code section 7031. Without ruling on the directed verdict motion, the case was submitted to the jury. After six days of deliberation, the court found the jury hopelessly deadlocked and declared a mistrial on the breach of *108 contract cause of action seeking specific performance. However, the jury was able to reach a verdict in Tierney's favor on the quantum meruit cause of action and awarded him $156,000 as the reasonable value of his services at Nasir's Mountain View station.
On April 9, 2015, Tierney requested that the trial court "having heard all of the evidence and argument in this case" decide on Tierney's specific performance claim in a statement of decision. Proposed statements were submitted by both parties. On August 6, 2015, the trial court filed its statement of decision holding that Tierney was not entitled to specific performance because he failed to perform his obligations under the PSA.
The trial court found Tierney's performance deficient for three reasons: First, the trial court found that the PSA set August 31, 2005, as the "Entitlement Deadline," by which Tierney had to secure the Entitlements, and he failed to meet the deadline. Second, the trial court found Tierney failed to pursue the Entitlements in "good faith" as required by Section 5(b) of the PSA because he spent seven months of the entitlement phase investigating commercial uses for the Property rather than residential units. Third, the trial court found Tierney had obtained the Entitlements on August 2, 2012, when the City authorized the CUP, and that Tierney had failed to pay the balance of the purchase price within 30 days of that date as required by the PSA for the second closing. The record contains no objections from Tierney to the statement of decision.
That same day, the trial court also filed a separate order on the quantum meruit claim. The court converted the Naz Parties' section 7031 motion for a directed verdict to a motion for judgment notwithstanding the verdict (JNOV) and vacated the jury's $156,000 award to Tierney.
On October 28, 2015, the trial court entered judgment in favor of the Naz Parties. On December 9, 2015, the court entered an amended judgment which awarded the Naz Parties $830,224.70 in attorneys' fees plus $96,233.12 in "non-statutory expenses."
On December 11, 2015, Tierney appealed both the breach of contract and quantum meruit causes of action.
DISCUSSION
I. Jury Trial Proceedings
Tierney raises a number of issues on appeal with respect to the proceedings in the trial's final days. He contends the trial court improperly undermined *109 the jury's effort to reach a complete verdict by (1) refusing to correct the special verdict form, (2) failing to clarify the jury's confusion about a special instruction, and (3) granting a needless mistrial. He says the court's alleged refusal to help the jury with the special verdict form prevented the jury from completing the verdict and this caused the trial court to improperly declare a mistrial. *782 The jury was asked to return a special verdict form answering six questions about the breach of contract claim and four related to quantum meruit. On Friday, April 3, 2015, after six days of jury deliberation, the jury informed the court it was able to decide the first three questions but was deadlocked on Question 4, which asked, "Did [Nasir and Dejauna] fail to do something that the contract required them to do?" The trial court suggested that "maybe ... over the weekend, the lawyers will come up with a different question for you to address."
The following Monday, Tierney moved to submit a substitute special verdict form to the jury. After hearing argument, the court stated it was "not inclined to give [the jury] a modified verdict form because it seems that there are objections that counsel cannot resolve. And the proposed modification, in addition, I think, may cause further confusion." The court directed counsel to meet and confer again to attempt to resolve the issue. However, counsel could not reach agreement on any change to the special verdict, and the trial court maintained its view that the proposed change would likely not resolve the jury's confusion. After some additional argument, the court directed counsel to meet and confer again. Again, they could not reach agreement. The court told the jury "there is no further instruction that I can provide you specifically ... at this time." The court found the jury hopelessly deadlocked and declared a mistrial on the contract cause of action. Later that week, Tierney requested that the trial court "having heard all of the evidence and argument in this case" decide specific performance in a statement of decision. The statement of decision which followed noted that "both parties requested that rather than re-set the case for jury trial, the Court issue a ruling as to whether Mr. Tierney is entitled to specific performance."
As a threshold matter, the Naz Parties argue that matters relating to the jury trial proceedings are not properly before the court because they relate to a non-appealable declaration of mistrial. We disagree. The Naz Parties are correct that a declaration of a mistrial is a non-appealable order ( Warner v. O'Connor (1962) 199 Cal.App.2d 770, 773, 18 Cal.Rptr. 902 ), but Tierney's appeal is not from the court's decision to grant a mistrial. Tierney's notice of appeal makes clear he appeals from the court judgment. Under Code of Civil Procedure section 906, an appeal from a judgment allows an *110 appellant to challenge all trial court actions that led to the judgment. (See Code Civ. Proc. § 906.) Tierney's claims of error with respect to the declaration of mistrial are appealable.
Even so, the Naz Parties contend Tierney waived his right to complain about what happened in the trial's final days. They contend Tierney's decision to ask the trial court to decide the specific performance claim rather than ask to reset the case or move for a new jury trial waives Tierney's arguments related to any errors in the late stages of trial. The cases they cite as authority, including Escamilla v. California Insurance Guarantee Association (1983) 150 Cal.App.3d 53, 197 Cal.Rptr. 463, concern whether parties waived their right to a jury trial, not whether they waived their right to appeal errors that occurred before they requested the court to decide a controversy, which is the particular issue here. Factually, we agree with Tierney that "[t]his situation is very unusual." Like Tierney, "[w]e have found no reported California case where something similar has happened."[2] Nonetheless, *783 based on the circumstances, including Tierney's request that the trial court decide his specific performance claim, we are persuaded that Tierney waived his right to assert alleged errors that may have occurred during jury deliberations.
Tierney's appeal about the jury trial is driven by his claim that "his victory [was] swept away" because he was on his way to a "pending favorable verdict." But reversing and setting aside the trial court's statement of decision, as Tierney urges, would not restore or somehow reconstitute the original jury or restore its favorable responses to any of the special verdict inquiries, all of which were nullified once the trial court declared a mistrial. (See In re Bartholomae's Estate (1968) 261 Cal.App.2d 839, 842, 68 Cal.Rptr. 332 ["A mistrial is equivalent to no trial; it is a nugatory trial."]; Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2011) ¶ 12:2, p. 12-1 ["A mistrial terminates the trial midproceedings for error .. that has prejudiced a party's right to a fair trial and that cannot otherwise be remedied. No matter how far the trial has progressed, a mistrial means the case must be retried from the beginning."].)
Reversal here would only secure for Tierney the right to impanel another jury. But he received an equivalent remedy from the trial court. In his "Request for Statement of Decision," filed April 9, 2015, Tierney wrote, "Plaintiffs hereby request that the Court prepare a Statement of Decision supporting its decision on Plaintiffs' First Cause of Action for Breach of Contract-Specific Performance." The court's statement of decision served as *111 the remedy for whatever errors may have occurred in the jury trial's final days. Such claims of error "did not affect[ ] the legitimacy of the statement of decision," as Tierney asserts. On this record, Tierney's belief that he would have received a more favorable outcome had the original jury completed the special verdict form with more intervention from the trial court is no more than speculation. It does not give us reason to invalidate the trial court's decision, since a litigant is not entitled to a rotation of juries and jurists until he achieves the outcome he desires.
Observing that a waiver is the intentional relinquishment of rights, Tierney argues that "there is no evidence [he] intended to relinquish his right to a completed verdict from the jury. In fact, he vigorously protested the mistrial declaration." He contends that it was "[o]nly after losing that argument did he consent to a court trial, which he did because he sought an equitable remedy-specific performance-which only the court may grant." We agree that Tierney urged the court to modify the special verdict form and supplement its instructions before the court declared a mistrial, but we disagree there was no evidence of his intent to waive his right to a complete jury verdict. He requested the court prepare a statement of decision. Just because Tierney's request came after the mistrial does not excuse him. Even then, Tierney could have asked the case be reset for a jury trial rather than proceed with a decision from the bench. Tierney's election to proceed with a statement of decision from the court reflected his decision to forego a retrial before a new jury.
Tierney further explains that he did not seek another trial on money damages before a new jury because he had already "endured the financial and emotional cost of a two-week jury trial." Tierney argues these circumstances were coercivce. We *784 disagree. Given the stakes and the Property's potential value, another developer may have chosen differently. The financial and emotional costs of litigation are no doubt significant, but they did not prevent Tierney from exercising his right to retry his case before a new jury and possibly secure the special verdicts he sought.
Finally, Tierney argues that accepting the Naz Parties' waiver argument would "leave the litigant faced with an erroneous mistrial with no practical remedy." Not so. Tierney could have retried the case. If a retrial was not practical, there are instances where litigants have petitioned for writ of mandamus requesting that a trial court vacate an order declaring mistrial. (See, e.g., Heavy Duty Truck Leasing, Inc. v. Sup. Ct. (1970) 11 Cal.App.3d 116, 119, 89 Cal.Rptr. 598.)[3]
*112 In light of our conclusion that Tierney waived his claims of error arising in the jury trial, we need not review Tierney's specific arguments with respect to those claimed errors and will proceed to consider his challenges to the trial court's statement of decision.
II. Specific Performance
A. Impact of Jury's Partial Verdict on Trial Court's Statement of Decision
Tierney first contends that the "jury's findings would have bound the court when it ruled on specific performance. So bound, the court could not have ruled as it did in its Statement of Decision." We disagree.
Falls v. Superior Court (1987) 194 Cal.App.3d 851, 239 Cal.Rptr. 862 ( Falls ) is instructive. There, the special verdict form given to the jury required findings on five questions: negligence, proximate cause, damages, the plaintiff's comparative negligence, and percentage of fault. ( Id. at p. 853, 239 Cal.Rptr. 862.) The jury answered the first two questions in the plaintiff's favor but could not agree on damages and did not answer the last two questions. ( Id. at p. 854, 239 Cal.Rptr. 862.) The trial court declared a mistrial, and denied the plaintiff's motion for an order adjudicating liability in his favor. ( Ibid. ) The plaintiff unsuccessfully sought a writ of mandate to compel the court to enter a partial verdict on liability and proximate cause. ( Ibid. ) The appellate court affirmed, explaining that a special verdict requires a jury to resolve all of the ultimate facts presented to it so that nothing remains for the court but to draw conclusions of law. ( Id. at pp. 854-855, 239 Cal.Rptr. 862.) Because the jury decided only two of the five "ultimate facts," the court was unable to draw any conclusion on liability. ( Id. at p. 856, 239 Cal.Rptr. 862.) The court further reasoned that awarding the plaintiff a partial verdict under the circumstances "would also severely prejudice defendant at the time of retrial, since the jury would be instructed that defendant's negligence was a fait accompli." ( Ibid. )
Here, the same concerns about prejudice following the declaration of a mistrial apply. Disregarding the jury's incomplete special verdict ensured that specific performance *785 did not become a fait accompli upon the trial judge's consideration of the merits. Unconstrained by the jury's incomplete special verdict, the trial court properly made its own independent findings of fact. *113 Tierney attempts to distinguish Falls on the basis that the jury's failure to reach a verdict in Falls was not due to the trial court's failure to assist the jury as here and this difference should lead to a different conclusion. We do not accept Tierney's characterization of the trial court's efforts, or his basis for distinguishing Falls . Special verdicts come with "recognized pitfalls," namely, they require the jury to resolve all of the controverted issues in a case, unlike a general verdict which merely implies findings on all issues in one party's favor. ( Falls , supra , 194 Cal.App.3d at p. 855, 239 Cal.Rptr. 862, City of San Diego v. D.R. Horton San Diego Holding Co., Inc. (2005) 126 Cal.App.4th 668, 678, 24 Cal.Rptr.3d 338 [" ' " '[T]he possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings.' " ' "] ) Just as in Falls , once the mistrial was declared in this case, the trial court properly ensured that the proceedings were not prejudiced by the inconclusive verdict. Denying the incomplete special verdict findings a fait accompli status accomplished this objective.
Hoopes v. Dolan (2008) 168 Cal.App.4th 146, 85 Cal.Rptr.3d 337 ( Hoopes ), which Tierney relies on, is not determinative. Hoopes involved legal and equitable claims and defenses between two commercial tenants claiming exclusive rights to the same parking spaces. ( Id. at pp. 151-153, 85 Cal.Rptr.3d 337.) In a special verdict, the jury "expressly found" the plaintiff had the right to exclude the defendants and their customers from the parking spaces. ( Id. at pp. 150, 154, 158, 85 Cal.Rptr.3d 337.) Later, the trial court "rejected the jury's factual findings and made its own independent evaluation of the evidence," and "found, contrary to the jury's special verdict, that" the plaintiff did not have the right to exclude defendants and their customers from the parking spaces. ( Id. at pp. 154-155, 85 Cal.Rptr.3d 337.) The appellate court held that the "trial court erred in disregarding the jury's verdict when ruling on equitable remedies that relied on common issues of fact previously adjudicated by the jury." ( Id. at p. 158, 85 Cal.Rptr.3d 337, italics omitted.) Unlike here, the Hoopes jury returned a special verdict ( id. at p. 154, 85 Cal.Rptr.3d 337 ), so Hoopes never addressed the consequences of an incomplete special verdict on fact finding in proceedings following the declaration of a mistrial. It does not apply.
B. Merits of Statement of Decision**
III.-IV.***
*114 DISPOSITION
The trial court's order granting judgment notwithstanding the verdict on the quantum meruit claim is reversed; and the trial court is directed to enter judgment on the verdict as rendered by the jury. Further, the amended judgment shall be modified to strike the $96,233.12 awarded in non-statutory costs. We otherwise affirm the judgment. The parties shall bear their own costs on appeal.
We concur:
McGuiness, Acting P.J.†
Jenkins, J.

The PSA contained two sections labelled number 8. This refers to the first Section 8, headed "Second Closing."

The Naz Parties point to Plumley v. Mockett (2008) 164 Cal.App.4th 1031, 79 Cal.Rptr.3d 822, as "a virtually identical case." The proceedings in the state court action described in Plumley share similarities to this case (id. at pp. 1037-1038, 79 Cal.Rptr.3d 822 ), but the legal issues and analysis are completely distinct.

Tierney also cites American Modern Home Ins. Co. v. Fahmian (2011) 194 Cal.App.4th 162, 170, 124 Cal.Rptr.3d 456, and Amerigraphics, Inc. v. Mercury Casualty Co. (2010) 182 Cal.App.4th 1538, 107 Cal.Rptr.3d 307, disapproved of on other grounds by Nickerson v. Stonebridge Life Ins. (2016) 63 Cal.4th 363, 203 Cal.Rptr.3d 23, 371 P.3d 242, for the proposition that a party's objection in the trial court to a special verdict form, even during post-trial briefing, allows the party to challenge the question on appeal. That is true, but neither of those cases involved a jury deadlock on the special verdict with a resulting mistrial and decision by the court. Our waiver decision is based on Tierney's election to proceed with a decision by the court, not on his failure to make his objections known.

See footnote *, ante .

See footnote *, ante .

Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.